**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| **Joseph Crystal**        * | |
| 355 Water Oaks Loop | |
| Santa Rosa Beach, FL 32459    * | |
| | |
|       **Plaintiff,**      * | |
| | |
| **v.**                       * | Case No.: _____ |
| | |
| **Anthony W. Batts**      * | |
| Baltimore Police Commissioner | |
| c/o 601 E. Fayette Street     * | |
| Baltimore, Maryland  21202 | |
| (In his official capacity)      * | |
| | |
| **Robert Amador**        * | |
| Sergeant | |
| c/o 601 E. Fayette Street     * | |
| Baltimore, Maryland  21202 | |
| (In his official capacity and Personal   * | |
| Capacity) | |
|                          * | |
| and                      * | |
| | |
| **Baltimore City Police Department** * | |
| 601 E. Fayette Street | |
| Baltimore, Maryland  21202    * | |
| | |
|     SERVE ON:          * | |
|     George A. Nilson, Esq. | |
|     City Solicitor          * | |
|     Baltimore City Department of Law | |
|     City Hall             * | |
|     100 N. Holiday Street, Suite 101 | |
|     Baltimore, MD 21201     * | |
| | |
|       **Defendants.**      * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

The Plaintiff, Joseph Crystal, by and through his undersigned attorneys, hereby sues Defendants Anthony B. Watts, Robert Amador, and the Baltimore City Police Department, and as the basis thereof states as follows:

## PARTIES

1.      Joseph Crystal (hereinafter "Plaintiff") is a citizen of the State of Florida.

2.      Baltimore City Police Commissioner Anthony W. Batts (hereinafter "Defendant Batts") is a resident of Baltimore City, State of Maryland and is currently employed by the Baltimore City Police Department.

3.      Sergeant Robert Amador (hereinafter "Defendant Amador"), is a resident of Baltimore City, State of Maryland and is currently employed by the Baltimore City Police Department.

4.      The Baltimore City Police Department (hereinafter "Defendant Baltimore City Police Department"), is an independent organization located in Baltimore City, State of Maryland.

## JURISDICTION

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

6.      Venue is proper pursuant to 28 U.S.C. § 1391.

7.      Notice was given to the Defendants under the Maryland Local Tort Claims Act on October 30, 2014.

## FACTS AND ALLEGATIONS COMMON TO ALL COUNTS

8.      At all times relevant hereto, the Plaintiff was a police officer employed by the Baltimore City Police Department.

9.      Plaintiff began working for Defendant Baltimore City Police Department on or about November 2008 as a Police Officer Trainee assigned to the Baltimore City Police Academy.  His performance was exemplary and he was appointed the Class Commander.

10.     Upon graduation from the Academy in 2009, Plaintiff received the Police Commissioner's Award from Police Commissioner Frederick Bealefeld for being the trainee that demonstrated the most leadership.

11.     On or about September 2009 through October 2010, Plaintiff had numerous assignments, including but not limited to: patrolling multiple districts; working the Northeast District Patrol; and working the Monument Street Initiative.

12.     Starting on or about October 2010, Plaintiff was promoted from the rank of Officer to Detective.

13.     After his promotion, Plaintiff was assigned to the Violent Crime Impact Section ("VCIS") Eastside, followed by VCIS Westside, where his duties included, but were not limited to, violent crime suppression and narcotics investigations.

14.     Plaintiff's performance record up until this point was beyond reproach and he was considered to be a rising star in the Baltimore City Police Department.

15.     In or about October 2011, Plaintiff witnessed an incident where fellow officers engaged in criminal conduct.  It was the Plaintiff acting as a concerned citizen and reporting this criminal conduct of fellow officers to the Baltimore City State's Attorney Office and the media which was the predicate for the unlawful acts perpetrated by the Defendants upon the Plaintiff.

16.     On or about October 27, 2011 the Plaintiff and fellow members of the Baltimore City Police Department observed Antoine Green take part in a suspected drug transaction. Specifically, Mr. Green was observed throwing away what officers suspected to be illegal drugs.

17.     Mr. Green fled the scene and Officers pursued him to an alleyway near the 2200 block of Prentiss Place in East Baltimore. At that location, Mr. Green kicked in the door to a home that backed into the alley.  The home to which Mr. Green kicked in the door belonged to the girlfriend of Officer Anthony Williams of the Baltimore City Police Department.

18.     Officer Williams' girlfriend called both the Baltimore City Police and Officer Williams to report the breaking and entering by Mr. Green. Baltimore City Police responded to the call and, after an initial confrontation, Mr. Green was arrested at the home.

19.     After Mr. Green was handcuffed and placed into custody, Mr. Green was transported in a police van to go to central booking so that he could be processed.  However, before the police van arrived at central booking, Sergeant Marinos Gialamas of Defendant Baltimore City Police Department called for Mr. Green to be returned to the house on Prentiss Place. It was at that time that Officer Williams, who was then off duty, and Sgt. Gialamas, physically assaulted Mr. Green.

20.     It was these criminal acts committed by Sgt. Gialamas and Ofc. Williams of Defendant Baltimore City Police Department against Mr. Green that Plaintiff would report to the Baltimore City State's Attorney Office and the news media.

21.     Despite multiple officers of Defendant Baltimore City Police Department being present and/or aware of this incident, none of them reported the conduct of Sgt. Gialamas and Ofc. Williams to internal affairs or any other agency within the Police Department.

22.     Attempts were made to "cover up" the assault on Mr. Green by Sgt. Gialamas, Ofc. Williams, and other officers of Defendant Baltimore City Police Department who were present and/or aware of this incident.

23.     Due to the conduct of his fellow officers as well as the inaction by Defendant Baltimore City Police Department against Sgt. Gialamas and Ofc. Williams, the Plaintiff reported the assault on Mr. Green to the Baltimore City State's Attorney Office.

24.     As a result of the Plaintiff's report, Ofc. Williams and Sgt. Gilamas were criminally charged for the assault on Mr. Green on or about Oct. 18, 2012.

25.     By October 2012, word had spread throughout the Baltimore City Police Department that the Plaintiff was the individual that had reported Sgt. Gialamas and Ofc. Williams. As a direct result, the Plaintiff began to endure harassment and threats from fellow officers of Defendant Baltimore City Police Department.

26.     Plaintiff first began to experience harassment and threats prior to October 18, 2012. One such incident occurred when the Plaintiff was walking with Sgt. Terry Bell of Defendant Baltimore City Police Department. Sgt. Bell advised the Plaintiff that a lot of people within the Baltimore City Police Department were telling Bell that the Plaintiff was "a rat" and to be careful working with him.  Sgt. Bell also advised the Plaintiff that a lot of officers did not want to work with Plaintiff or to have him on their squad.

27.     On or about October 19, 2012, the day after Sgt. Gialamas and Officer Williams were criminally charged, Lieutenant Tracey Geho of Eastside VCID stated to the Plaintiff, with Det. Fuller present, "I told you Gialamas was fucked.  I want to know who the source is."  Lt. Geho then got very close to the Plaintiff's face and, while pointing his finger in Plaintiff's face, stated "What the fuck are you going to say?!"  Lt. Geho also stated, "Know your numbers are going to stay open and you are going to get charged with perjury when you testify.  Your story better not change even a little bit."

28.     Another example took place on or about October 26, 2012, when the Plaintiff received a disturbing phone call from Defendant Amador. Plaintiff's wife witnessed the statements uttered by Defendant Amador, including but not limited to Defendant Amador yelling, "You better pray to God you are not the star witness, because your career is already fucked, but if you're the star witness you may as well just resign."   Defendant Amador also stated that Plaintiff, "did not have to lie but he did not have to bury the motherfucker.  You better pray you are not the star witness against 'G'."

29.     After the telephone call ended, Plaintiff knew that the culture of the Defendant Baltimore City Police Department would condone this type of behavior.

30.     Plaintiff felt threatened and feared for his safety.

31.     Plaintiff was thereafter labeled a "rat" and was constantly referred to as such by police officers both behind his back and to his face.

32.     One example of this conduct was on or about June 30, 2012. On that date the Plaintiff was working overtime in the Eastern District with Officer (now Sergeant) Fontaine Smallwood and they were assisting an officer who was in a motor vehicle accident.  Also present were Sgt. Burns and Det. Calvin Moss, both of whom were present during the incident involving Mr. Green.  Det. Moss pulled up in his automobile and stated to Plaintiff and the others, "Hey, are you guys having a cheese party?"   After Plaintiff responded that he did not want any problems, Det. Moss stated, "What?  I'm just asking whether you are having a cheese party.  I know rats like cheese."

33.     On or about November 13, 2012, Plaintiff received a telephone call from Defendant Amador to pick up a Confidential Informant ("CI") Slip at headquarters that had been filed regarding a Controlled Narcotics purchase that occurred on or about September 29, 2012

and to bring it to him at the Western District.  The reason for Defendant Amador's request was because he wanted Plaintiff to change the date on the CI slip from the actual date of the purchase, September 29, 2012, to a date after October 4, 2012, which would have created a fraudulent report.

34.     Defendant Amador ordered Plaintiff to perform a Confidential Informant Narcotics buy on September 29, 2012, and part of his order was to make Plaintiff use his own personal money because there was no money allotted by the Baltimore City Police for this operation. Defendant Amador promised to reimburse Plaintiff for the advanced monies for the successful purchase, and while he initially did, after Plaintiff refused to now falsify the CI slip -- stating that he would rather explain what occurred than alter the official record -- Amador demanded that Plaintiff give to him $100 and then threatened that he would charge him departmentally if Plaintiff continued to refuse to alter the document.  Because of Defendant Amador's threat, Plaintiff gave him $100, however, Plaintiff nevertheless again refused to falsify the document, and reasonably believed that the Defendant Baltimore City Police Department was trying to set him up with altering the police voucher.  The Department never reimbursed Plaintiff after he reported this incident.

35.     Defendant Baltimore City Police Department failed to do anything to stop the conduct described in the preceding paragraphs.

36.     On or about November 14, 2012, Plaintiff met with Robert Cherry at the Fraternal Order of Police Lodge with a journal that Plaintiff kept of these events, and a copy of the CI slip. Mr. Cherry advised Plaintiff that Sgt. Gialamas had also come to see him. Plaintiff advised Mr. Cherry that he was scared for his safety, and offered him copies of the documents which Mr. Cherry declined.  Mr. Cherry stated that OCD was "blood in and blood out" and that is why

VCIS was so mad at him.  Mr. Cherry also suggested the Plaintiff look into going to another agency.

37.     In or about November 2012, Plaintiff reported the "rat" incident to Internal Affairs and provided a copy of his journal up to that time.

38.     Plaintiff initially met with Det. Cathy Klein of Internal Affairs and later with both Det. Klein and Sgt. Chad Ellis who was part of the FBI Corruption Unit.   They considered Sgt. Amador a suspect of the rat incident and Plaintiff was asked if he would speak to Sgt. Amador with a recording device.  However, Sgt. Ellis then determined that he did not feel comfortable putting Plaintiff in that position.

39.     On November 15, 2012, Plaintiff spoke with Assistant State's Attorneys Paul Pineau and Shelley Glenn, who was in charge of the Police Integrity unit, and told them about Defendant Amador's request to falsify the CI slip.

40.     On or about November 29, 2012, Plaintiff met with Lt. Morris of Defendant Baltimore City Police Department. Lt. Morris brought Plaintiff to Deputy Commissioner John Skinner who advised that he had read Plaintiff's journal. Deputy Commissioner Skinner told the Plaintiff that he had done nothing wrong, that they were going to move quickly, and that people would lose their jobs and be going to jail over the harassment of Plaintiff.

41.     However, on or about November 30, 2012, when the Plaintiff next spoke with Lt. Morris' office, he was informed that all supervisors of Internal Affairs were instructed by the Chief of Internal Affairs that they were not to talk to Plaintiff any further.

42.     Plaintiff spoke with Det. Cathy Kline of Internal Affairs before she retired in 2013. Det. Kline advised that she was going to say in her exit interview that Plaintiff had not

been treated right by Defendant Baltimore City Police Department.  Det. Kline was subsequently rehired by Defendant Batts.

43.     Chief Hill stated to Plaintiff that the retaliation and harassment issue involving Plaintiff never received individual attention and was lumped into the Sgt. Gialamas matter. Indeed, Internal Affairs continued to use the same file number for the Gialamas-Greene misconduct investigation as for the harassment of Crystal investigation – the latter of which should have been solely focused on what was being done by Defendant Baltimore City Police Department to Plaintiff.

44.     Throughout the next months, Plaintiff endured much of the same comments from other Officers but Defendant Amador was the most persistent in telling anyone and everyone in the Department that Plaintiff was a "Rat."

45.     Defendant Amador directly threatened the Plaintiff and on or about October 9, 2012, he stated to Plaintiff, "People don't like you and you need to watch your back."  Plaintiff took this statement as a direct threat of physical harm and feared for his safety.

46.     Another incident of direct harassment was in or about November 2012. Defendant Amador telephoned Plaintiff on multiple occasions so as to harass Plaintiff.  Specifically, Defendant Amador would say that Plaintiff had "snitched to Internal Affairs" and now the Prosecutors are "talking about jail time."

47.     Defendant Amador admitted in one phone call that Lieutenant Michael Frye of Defendant Baltimore City Police Department informed Defendant Amador that Plaintiff "snitched" and "the whole Department knows it was you."

48.     Soon after this call on about November 23, 2012, Plaintiff found a dead rat on his vehicle in Baltimore County.

49.     Plaintiff reported this incident to Baltimore County Police.  The Baltimore County officer who inspected Plaintiff's car found that the dead rat was on the passenger side portion of the windshield with its head underneath the windshield wiper.   Baltimore County police considered the incident to be a form of witness intimidation, and forwarded its report to Baltimore City Internal Affairs and the Baltimore City State's Attorney's Office, neither of whom ever contacted Plaintiff.

50.     From this incident forward Plaintiff's safety was at stake in that he would call for backup in certain situations and no backup would come.  On or about November 6, 2012, while Plaintiff was conducting a drug stop, he observed a male adult walking across the street.  As Plaintiff approached the male adult ran.  Plaintiff radioed that he was in a foot chase, however no one from either his squad or VCIS responded to the call.  After a great delay, someone from patrol finally responded but only after Plaintiff had apprehended the suspect by himself. Detectives Gerald Hensley and David McGowan were observed to have had their radios on during this event but neither responded to Plaintiff's call for back up.

51.     A few days later, an additional incident occurred when on or about November 8, 2012, Plaintiff received a tip about illegal drug sales.  While observing the suspects involved in a drug transaction Plaintiff stopped the two suspects and called for backup.  An unidentified voice then came on the radio and asked, "Where is that officer at?"  Plaintiff gave directions over the radio for how to get to his location.  Defendant Amador called Plaintiff's cell phone, not over the radio, and gave him a direct order to return back to the District and that he would not be given back up.  Plaintiff asked Defendant Amador why he did not provide backup and Defendant Amador responded to let the suspects go and to come in, that Plaintiff was being kicked out of VCID.

52.     Defendant Amador at one point ordered Plaintiff to turn in his Detective badge and identification card, and obtain instead a new Officer identification card because Plaintiff would no longer be a Detective. Defendant Amador further said he was ordering him to appear first thing Monday morning to get an Officer's badge, as ordered by his supervisor. Plaintiff had been off work at this time for his wedding anniversary. When Plaintiff went to the Quartermaster the next Monday as ordered, however, the Quartermaster advised Plaintiff that he would not perform the demotion as Defendant Amador had not submitted a proper transfer order.

53.     On or about February 15, 2014, Detective Haggie reminded Plaintiff that, "Nobody wants to ride with you."  Plaintiff took this to mean that no one in the Department wanted to work with him or provide back up to him.

54.     On or about February 24, 2014, Plaintiff received a call that Commissioner Batts wanted to meet with him the same day, as well as Comm. Batts' Chief of Staff and Chief Hill, because Jane Miller asked to interview Plaintiff.  Comm. Batts advised that he will allow him to do the interview, and that they will get to the bottom of what happened to him, but that Plaintiff was not to talk about policy.  Shortly before the Jane Miller interview aired on television, a fake Twitter account impersonating Plaintiff streamed on the WBAL website and Twitter.

55.     On or about March 15, 2014, around the time that Sgt. Gialamas was to be sentenced, receiving overtime pay also became a sudden problem for Plaintiff.  Despite working six (6) days in a row which entitled Plaintiff to overtime pay, and regardless that other officers were receiving similar overtime pay, he was told by an angry Lieutenant Herbert Timberlake that he was not entitled to and would not receive it.  Lt. Timberlake was yelling at Plaintiff over the telephone, and told him that if he was going to do this then to just go home.  Plaintiff responded that he could not go home because he was securing a house in reference to an officer who had

been shot and was already there.  When Plaintiff asked Timberlake why overtime pay was now an issue for him when other Detectives were receiving it, Timberlake responded, "Fine stay if you want to play games we can play games.  Just stay and we will see what happens."

56.     On or about March 19, 2014, Plaintiff then was passed over for a new police vehicle and was advised by a supervisor that command had instructed that Plaintiff was detailed out while his situation "blows over."  Plaintiff was also advised that command was not going to do an investigation into what was being done to Plaintiff in the Department, that if they wanted to do one they would have done so two (2) years ago, and that Defendant Batts was aware of the situation and intentionally moved the Plaintiff off-site so that he could not make any complaints on any other police officers.

57.     On or about March 24, 2014, Sergeant Harvey Martini sent an email to Plaintiff's Officer in Charge stating that Plaintiff was being detailed on April 18 and 19, 2014 and to adjust his schedule so Plaintiff would not be working a 6th work day as overtime.

58.     On or about June 2014, Plaintiff's security clearance is suddenly removed and he is pulled from working with the FBI.  Plaintiff received a text message from Captain John Bartness who is head of the Investigation that they do not know who or why that determination was made, that it was not anything from Baltimore City.  Plaintiff also received an email that he will be doing burglary detail next week.  However, by Sunday evening, Plaintiff still does not know where he is to physically show up for work Monday despite requests for clarification. Plaintiff used five vacation days so that he could figure out where he was to report for his new detail assignment.

59.     Plaintiff was eventually placed on the midnight to 8:00 a.m. burglary detail, followed by the North East rape detail from 7 p.m. to 3 a.m., and then again the Burglary detail.

Nevertheless, during this time, Plaintiff remained "officially" in the Intelligence squad. This was then followed with Plaintiff being told to clean out his office and without any instruction of where he is to go.

60.     With pervasive retaliation against him condoned and fostered by Defendants, and with his career as a Detective destroyed by the Defendants, Plaintiff resigned on September 3, 2014.

61.     Efforts were made by the Defendants to smear and tarnish Plaintiff during the time of his departure, including with news reporter Justin Fenton who was contacted and advised by members of the Defendant Baltimore City Police Department that Plaintiff was quitting because he was about to be fired. This was not true.

62.     Despite the Defendant Baltimore City Police Department promising a full investigation into Plaintiff's allegations, and Commissioner Batts promising he would get to the bottom of what happened, nothing has come of the investigation into what the Department did and allowed to continue to happen to Plaintiff for whistleblowing police misconduct.

COUNT I
FIRST AMENDMENT RETALIATION - FREEDOM OF SPEECH
42 U.S.C. § 1983
(All Defendants)

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

63.     Crystal had knowledge of the existence of facts relating to these crime(s) or delinquent act(s) allegedly committed by Sgt. Gialamas and Off. Williams.

64.     Although it was not part of or pursuant to Crystal's official duties, as a concerned citizen Crystal reported these crime(s) or delinquent act(s) and spoke with prosecutor(s) at the

Baltimore City State's Attorney.   Criminal charges were thereafter brought against both Off. Williams and Sgt. Gialamas.

65.   Although it was not part of or pursuant to Crystal's official duties, as a concerned citizen and pursuant to subpoenas to testify, Crystal's testimony under oath of these crime(s) or delinquent act(s) was received as evidence at the criminal trials of Off. Williams' and Sgt. Gialamas' in February 2014.

66.   Although it was not part of or pursuant to Crystal's official duties, Crystal as a concerned citizen reported to and spoke with the Baltimore City Assistant State's Attorney about the retaliation that he as experiencing by the Department for reporting the Gialamas-Williams-Green matter and for testifying at Sgt. Gialamas' and Off. Williams' criminal trials.

67.   A jury convicted Off. Williams of second-degree assault.   A jury convicted Green of obstructing and hindering.

68.   A jury convicted Sgt. Gialamas for misconduct in office.

69.   Although it was not part of or pursuant to Crystal's official duties and as a concerned citizen, Crystal spoke with the media about the retaliation he experienced by the Department for  reporting the illegal actions of Sgt. Gialamas and Off. Williams, speaking with the Baltimore City Assistant State's Attorney, testifying under oath at the criminal trials of Sgt. Gialamas and Off. Williams.

70.   The harassment and retaliation against Crystal, and which was permitted and fostered by the Department, was a result of Crystal's whistle-blowing to the Baltimore City State's Attorney Office, speaking to the Baltimore City State's Attorney Office about the Gialamas-Williams-Green matter, Crystal's testimony under oath against Off. Williams and Sgt. Gialamas for their alleged police misconduct and criminal actions, and speaking to the press

about these events and the retaliation he was experiencing from the Department.  Crystal has experienced taunting, intimidation, personal threats, and harassment that have endured since blowing the whistle on the police misconduct to the Baltimore City State's Attorney, since speaking with the Baltimore City State's Attorney about these matters, since testifying under oath as a witness at the criminal trials of Sgt. Gialamas and Off. Williams, since speaking to the media about these events and the retaliation he was experiencing from the Department.  After his employment at the Department became intolerable because of the retaliation, Crystal resigned and is no longer with the Department, while Off. Williams, Sgt. Gialamas, while the supervisors and fellow employees who retaliated against him remain with the Department.

71.     After making the Gialamas-Williams-Green misconduct and the retaliation against him that followed known to supervisors at the Department, after he spoke with the Baltimore City State's Attorney, after he testified under oath at the criminal trials of Sgt. Gialamas and Off. Williams, and after he spoke to the media, Crystal was further subjected to harassment, taunting, and an intolerable and hostile work environment, and his position, assignments and career were directly affected.  Plaintiff states that his speech and his actions in reporting the crime(s) or delinquent act(s) allegedly committed by Sgt. Gialamas and Ofc. Williams against Mr. Greene to the Baltimore City State's Attorney, in speaking with the Baltimore City State's Attorney about the illegal actions and the retaliation he was receiving by the Department, in testifying under oath at the criminal trials of Sgt. Gialamas and Off. Williams, in reporting the Gialamas-Williams-Green matter and the retaliation he was receiving by the Department to the media, were protected expressions regarding matters of public concern.

72.     Plaintiff asserts that his interest in First Amendment expression outweighs whatever interest the Defendants had regarding maintaining control over the workplace.

73.     Plaintiff asserts that he was unjustifiably subjected to retaliation, harassment, threats, and an intolerable and hostile work environment by the Defendants as a result of his whistleblowing police misconduct in the Gialamas-Williams-Green incident.

74.     Plaintiff asserts that he was unjustifiably investigated by the Internal Affairs Divisions of the Department.

75.     Plaintiff asserts that he ultimately lost his valuable benefit of public employment due to the actions of the Defendants.

76.     Plaintiff asserts that a causal relationship exists between his protected expressions on matters of public concern and these adverse employment actions.

77.     The actions complained of herein violate the Plaintiffs right to free speech under the First Amendment of the U.S. Constitution.

WHEREFORE, Plaintiff prays for Judgment:

(a)     Issuing an award to compensate for all other non-economic damages incurred by the Plaintiff, including but not limited to, the humiliation, stress, mental anguish, embarrassment, and loss of enjoyment of life suffered by the Plaintiff, in an amount no less than $500,000.00;

(b)     Issuing an award of nominal damages (in the alternative, if compensatory damages are not awarded);

(c)     Awarding Plaintiff his costs and reasonable attorney's fees in this action;

(d)     Granting punitive damages against the Defendants in the amount of $1,000,000.00; and

(e)     Granting such other and further relief as this Court may deem just and proper.

COUNT II
FREEDOM OF SPEECH RETALIATION
Maryland's Declaration of Rights Article 40
(All Defendants)

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

78.    Plaintiff states that the actions previously complained of herein also violate the Plaintiff's right of freedom of speech and expression, as protected by Maryland's Declaration of Rights, Article 40.

WHEREFORE, Plaintiff prays for Judgment:

(a)    Issuing an award to compensate for all other non-economic damages incurred by the Plaintiff, including but not limited to, the humiliation, stress, mental anguish, embarrassment, and loss of enjoyment of life suffered by the Plaintiff, in an amount no less than $500,000.00;

(b)    Issuing an award of nominal damages (in the alternative, if compensatory damages are not awarded);

(c)    Awarding Plaintiff his costs and reasonable attorney's fees in this action;

(d)    Granting punitive damages against the Defendants in the amount of $1,000,000.00; and

(e)    Granting such other and further relief as this Court may deem just and proper.

COUNT III
VIOLATION OF MARYLAND WAGE AND HOUR LAW
(Baltimore City Police Department)

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

79.    The Plaintiff states that his last day of work was September 3, 2014.

80.     The amount due and owing on the Plaintiffs last paycheck includes unused sick and vacation time and is approximately in the amount of $10,000.

81.     Plaintiff has requested his last paycheck from the Defendant Baltimore City Police Department but Defendant has refused to pay Plaintiff for his last paycheck, unused sick time and unused vacation time.

WHEREFORE, Plaintiff prays for Judgment:

(a)     Issuing an award to compensate for all other non-economic damages incurred by the Plaintiff, including but not limited to, the humiliation, stress, mental anguish, embarrassment, and loss of enjoyment of life suffered by the Plaintiff, in an amount no less than $30,000.00;

(b)     Issuing an award of nominal damages (in the alternative, if compensatory damages are not awarded);

(c)     Awarding Plaintiff his costs and reasonable attorney's fees in this action;

(d)     Granting punitive damages against the Defendants in the amount of $5,000,000.00; and

(e)     Granting such other and further relief as this Court may deem just and proper.


COUNT IV
CONSTRUCTIVE DISCHARGE
(Baltimore City Police Department)

Plaintiff incorporates by reference and re-alleges the allegations contained in the preceding paragraphs, as if fully set forth below.

82.     Plaintiff states that the actions complained of herein constituted constructive discharge under Maryland law.

83.     Defendant Baltimore City Police Department, as Plaintiff's employer, deliberately caused or allowed Plaintiff's working conditions to become so intolerable that Plaintiff was forced into an involuntary resignation.

84.     Defendant Baltimore City Police Department intentionally harmed or injured Plaintiff, with the intent of retaliating against him for whistleblowing police misconduct.

85.     Plaintiff did not resign in order to avoid being fired. Plaintiff was forced to resign by the Defendants because he was reasonably fearful of his safety as a result of the Defendants' actions.

86.      The retaliation and harassment by the Defendants was known and tolerated by the Defendant Baltimore City Police Department.

WHEREFORE, Plaintiff prays for Judgment:

(a)     Issuing an award to compensate for all other non-economic damages incurred by the Plaintiff, including but not limited to, the humiliation, stress, mental anguish, embarrassment, and loss of enjoyment of life suffered by the Plaintiff, in an amount no less than $500,000.00;

(b)     Issuing an award of nominal damages (in the alternative, if compensatory damages are not awarded);

(c)     Awarding Plaintiff his costs and reasonable attorney's fees in this action;

(d)     Granting punitive damages against the Defendants in the amount of $5,000,000.00; and

(e)     Granting such other and further relief as this Court may deem just and proper.

Respectfully submitted,

/S/ A. Donald C. Discepolo

_____

A. Donald C. Discepolo
Federal Bar No. 25525
don@discepolollp.com
Alan B. Neurick
Federal Bar No. 14607
alan@discepolollp.com
Discepolo LLP
111 South Calvert Street
Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 296-0780
Fax: (410) 296-2263
*Attorneys for Plaintiff*

### DEMAND FOR JURY TRIAL

The Plaintiff, by his undersigned attorneys, hereby demands a jury trial as to all issues triable by a jury.

Respectfully submitted,

/S/ A. Donald C. Discepolo

_____

A. Donald C. Discepolo
Federal Bar No. 25525
don@discepolollp.com
Alan B. Neurick
Federal Bar No. 14607
alan@discepolollp.com
Discepolo LLP
111 South Calvert Street
Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 296-0780
Fax: (410) 296-2263
*Attorneys for Plaintiff*