**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division**

| | | |
|---|---|---|
| JOSEPH CRYSTAL, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: 1:14-CV-03989-JKB |
| BALTIMORE CITY POLICE DEPARTMENT, *et al.*, | * | |
| | * | |
| Defendants. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OMNIBUS OPPOSITION
TO DEFENDANTS ANTHONY W. BATTS AND BALTIMORE POLICE
DEPARTMENT'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND
DEFENDANT ROBERT AMADOR'S MOTION TO DISMISS**

Plaintiff Joseph Crystal, by and through his undersigned attorneys, respectfully files this memorandum of law in support of plaintiff's omnibus opposition to defendants Anthony W. Batts and Baltimore Police Department's motion to dismiss or, in the alternative, for summary judgment, and Defendant Robert Amador's motion to dismiss, and in support thereof states:

## I.    **Introduction**

The First Amendment remains as the essential source of protection for all police officers who suffer job related retaliation for the exercise of free expression.  In *Durham v. Jones*, 737 F.3d 291(4th Cir. 2013), the Fourth Circuit addressed representative First Amendment retaliation cases which illustrate the contemporary employment environments confronting police officers in the new millennium.[1]

---

[1]    The officer in *Durham* was held to enjoy First Amendment protections.

As government has grown, so has the abuse of power by government employers.[2]

Americans from all walks of life rely on the Constitution for protection from arbitrary and

oppressive government power.[3]   Contemporary law enforcement bureaucracies afford vast

opportunities for bureaucrats to employ abusive tactics that are retaliatory.[4]   Retaliation by

government agencies frequently arises in many different contexts.[5]

The Supreme Court has held that law enforcement officers are not relegated to a "watered

down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).  Lower

courts have historically followed the Supreme Court's teachings that constitutional protections

for America's law enforcement officers are entitled to great weight. *See*, *e.g.*, *Edwards v. City of

Goldsboro*, 178 F.3d 231 (4th Cir. 1999); *Barrett v. Thomas*, 649 F.2d 1193 (5th Cir. 1981);

*Konraith v. Williquette*, 732 F. Supp. 973, 978 (W.D. Wis. 1990) (constitutional rights of law

enforcement officers "must be afforded great weight").

"It is well settled that the state may not abuse its position as employer to stifle 'the First

Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of

public interest.'"  *Dahlia* (citation omitted).  Moreover, the public has a strong interest in hearing

---

[2]     Millions of individuals are employed by more than eighty two thousand governmental units at local, state, and federal levels.  As of 1991, more than 18 million persons were employed by local, state or the federal government. See *Waters v. Churchill*, 114 S. Ct. 1878, 1899 n. 3 (1994) (Stevens, J. and Blackmun, J., dissenting) (citing the 1991 figures from the U.S. Department of Commerce Statistical Abstract of the United States, Table No. 500, page 318 (113 ed. 1993).

[3]     *See* Senator Sam J. Ervin, Jr., *Preserving The Constitution*, 165, 213 - 214 (1984); Boward, *Lost Rights: The Destruction of American Liberty*, 1-6, 49-51 (1995).

[4]     *See Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996) (cataloging cases of government retaliation in different contexts).

[5]     *See* Levinson, *Silencing Government Employee Whistleblowers In The Name of "Efficiency,"* 23 Ohio Northern U. L. Rev. 17 (1996) (cataloging numerous cases demonstrating retaliation against police officers).

from public employees, especially because "[g]overnment employees are often in the best position to know what ails the agencies for which they work." *Waters v. Churchill*, 511 U.S. 661, 674 (1994).

The Supreme Court has recognized that "the First Amendment interests at stake extend beyond the individual speaker . . . [because of] the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419.  As an inevitable result of the Court's jurisprudence and sound public policy, the First Amendment generally protects public employee whistleblowers from employer retaliation. *Dahlia*.

The Complaint alleges, *inter alia*, that:  The plaintiff was retaliated against by the defendants after he engaged in speech protected under the First Amendment:  when the Gialamas-Williams-Green criminal conduct, and the retaliation against him that followed, was made known to supervisors at the Department; after Crystal spoke with the Baltimore City State's Attorney; after Crystal under subpoena testified under oath at the joint criminal trial of Sgt. Gialamas and Off. Williams; after he spoke to the media.  *See, e.g.,* Complaint at ¶ 71. Crystal was subjected to harassment, taunting, and an intolerable and hostile work environment, and his position, assignments and career were directly affected.  The Complaint alleges a pattern of pervasive retaliatory conduct against Crystal by the defendants, conduct that was also condoned and fostered by defendant BPD.

## II.  <u>Background Facts and Material Facts in Dispute</u>

Plaintiff incorporates by reference the Facts and Allegations Common to All Counts from the Complaint as being truthful and read in a light most favorable for the plaintiff at this stage of the proceedings.  In addition, the following material facts, as they relate to the issues raised by

the defendants' motions, are from the plaintiff's attached declaration and are in serious dispute

with the additional facts asserted by the defendants in their motions for summary judgment:

1.   Following the October 27, 2011 incident involving Sgt. Marinos Gialamas and Ofc. Anthony Williams that is described in the Complaint filed in this action (the "incident"), Crystal knew that he had to report these officers' criminal conduct, but was initially was unsure as to who to report to because Sgt. Gialamas was his supervisor, the very person whom Crystal would normally be reporting to.  *See* Declaration of Joseph Crystal, attached hereto as **"Exhibit 1."**

2.   Prior to the incident, and during his time with the Baltimore Police Department ("BPD"), Crystal had received one class on ethics in the police academy and an Internal Affairs ("IID") briefing that was approximately one (1) hour wherein the IID's role in the BPD was discussed.  *See id.*

3.   The one class lasted approximately two and half hours and was listed as an ethics seminar taught by instructor Hicks.  During this class, it was taught that if officers saw something that they believed was wrong to report it to their supervisor.  The course gave an example but did not explain what to do if it was the officer's supervisor who acted wrong, or if the supervisor to whom the incident was reported to told the reporting officer to "keep his mouth shut."  *See id.*

4.   General Order C-2 does not explain the specifics of how to report wrongdoings.  *See id.*

5.   On the night of October 27, 2011, Crystal decided to telephone defendant Sgt. Robert Amador as he was a supervisor in the same division that Crystal was working in.  Crystal reported to Sgt. Amador what happened and asked Sgt. Amador if Crystal needed to do anything else to report the incident.  *See id.*

6.   Sgt. Amador instructed me to "keep [my] mouth shut, and also warned me that if Crystal talked to Internal Affairs or anyone else Crystal would be labeled a snitch and his career would be over."  Sgt. Amador further said to me that, should internal Affairs speak with me about the incident, that Crystal should tell them what Crystal did during the incident but not to say what Crystal heard because they could not prove it.  *See id.*

7.   Crystal spoke to Sgt. Amador because he was a Sergeant and supervisor in the BPD within his division and CRYSTAL believed that, with this BPD supervisor telling him to keep his mouth shut that the BPD wanted the

incident to be kept quiet.  At that point in time, Crystal did not know how he could report the incident as a police officer.  *See* Exhibit 1.

8.  About a week later, acting outside his job duties, Crystal acted as a concerned citizen and made arrangements while not on duty to meet on a Sunday with a State's Attorney in the narcotics division that his wife and Crystal were friends with, for the purpose of reporting to her what Crystal observed about the incident so that something would be done about this serious matter.  This was also the only way that Crystal could think of to report the incident since the training that Crystal was given at the police academy did not specify how to report an incident like this, when his supervisor was the subject of the criminal conduct and the supervisor that he instead reported the incident to instructed him to be quiet.  Crystal also advised the narcotics State's Attorney about the response he received from Sgt. Amador.  *See id.*

9.  Despite Crystal's reporting to supervisor Sgt. Amador the excessive force of the incident, Sgt. Amador instructed Crystal to keep his mouth shut and did not order Crystal to submit any further report of the incident.  *See id.*

10.  Crystal acted as a concerned citizen and not in performance of his job duties when Crystal appeared in response to a subpoena to testify at the joint criminal trial of Sgt. Marinos Gialamas and Ofc. Anthony Williams in the Baltimore City Circuit Court.  During the time both before, and after his testimony, Crystal was threatened, harassed and experienced retaliation for his testimony by the defendants to this action.  *See id.*

### III.    Standard of Review

Defendants Anthony W. Batts and Baltmore Police Department have moved to dismiss

or, in the alternative, for summary judgment.  Defendant Robert Amador has moved to dismiss.

A district court should grant a motion to dismiss only if "'it is clear that no relief could be granted

under any set of facts that could be proved consistent with allegations.'"  *H.J. Inc. v.

Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989) (quoting *Hishon v. King Spalding*, 467

U.S. 69, 73 (1984)).  In applying this standard, a district court must "read the facts alleged in the

complaint in the light most favorable" to the plaintiff and accept these factual allegations as true.

*H.J. Inc.*, 492 U.S. at 249; *see also Leatherman v. Tarrant County Narcotics Intelligence and*

*Coordination Unit*, 507 U.S. 163 (1993) (noting the Federal Rules' liberal system of notice pleading).

Additionally, a plaintiff is not required to set out in detail the facts upon which he or she bases a claim. *Conley v. Gibson*, 355 U.S. 41, 47 (1957). A plaintiff need only give a statement of his or her claim that will give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* Therefore, where a complaint is filed that charges each element necessary to recover, the dismissal of the case for failure to set out evidential facts can seldom be warranted. *See U.S. v. Employing Plasterers Ass'n*, 347 U.S. 186,189 (1954). Moreover, pleadings are more liberally construed where, as here, "the plaintiff alleges civil rights violations. . . ." *Tsai v. Rockefeller Univ.*, 137 F.Supp.2d 276, 280 (S.D.N.Y. 2001) (*quoting Cruz v. Gomez*, 202 F.3d 593, 596 (2d Cir. 2000)) (*quoting Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)).

Fed. R. Civ. P. 12(d) provides that, if "matters outside the pleadings are presented to and not excluded by the court" in connection with a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

Under Rule 56(a), summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (citing former Fed. R. Civ. P. 56(c)). When this burden is met, the non-moving party then bears the burden of demonstrating that disputes of material fact preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586; *see also In re Apex Express Corp.,* 190 F.3d 624, 633 (4th Cir. 1999).

As indicated, in resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587; *see also Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir.2002). "A party opposing a properly supported motion for summary judgment `may not rest upon the mere allegations or denials of [its] pleadings,' but rather must `set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir.2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied,* 541 U.S. 1042 (2004); *see Celotex Corp.,* 477 U.S. at 322-24.

In addition, this case is in the early stage of litigation. Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 448 (4th Cir. 2011). To raise adequately the issue that discovery is needed, the non-movant must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods,* 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

The "judge's function" in reviewing a summary judgment motion is not "to weigh the evidence and determine the truth of the matter," but rather, "to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249. If "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party," there is a dispute of material fact that

precludes summary judgment. *Id.* at 248.

## IV.    <u>Argument</u>

### A.    Crystal's Speech was Protected Under the First Amendment to the Constitution of the United States and was Performed as a Concerned Citizen on a Matter of Public Interest

The Supreme Court has described a two-step inquiry into whether a public employee's

speech is entitled to protection:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises.  The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Garcetti*, 547 U.S. at 418 (citations omitted).  In § 1983 First Amendment retaliation cases "[t]he

Supreme Court has made it clear that 'policemen, like teachers and lawyers . . . are not relegated

to a watered-down version of constitutional rights."  *Garrity v. New Jersey*, 385 U.S. 493, 500

(1967).

As an initial matter, the defendants do not dispute that Crystal's speech – reporting police

abuse, the attempts to suppress its disclosure and both the retaliation by the defendants and the

condoning of that retaliation by the BPD – is quintessentially a matter of public concern.  Speech

involves matters of public concern "when it can 'be fairly considered as relating to any matter of

political, social, or other concern to the community,' or when it 'is a subject of legitimate news

interest; that is, a subject of general interest and of value and concern to the public.'"  *Snyder v.

Phelps*, 131 S. Ct. 1207, 1216 (2011) (citation omitted).; *see also Connick*, 461 U.S. at 148

(noting that speech warrants protection when it seek[s] to bring to light actual or potential

wrongdoing or breach of public trust"); *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir.

2004) (finding that "[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern"); *see also Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (noting that "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public").

       **1.       Crystal's Speech of Reporting the Police Misconduct was Performed Outside His Job and as a Concerned Citizen**

The facts giving rise to Crystal's right to bring a § 1983 claim for the retaliation he experienced by the defendants were the result of Crystal's speech performed outside his job duties and as a concerned citizen for the purposes of a First Amendment analysis. The Complaint describes both specific examples and systemic retaliation against Crystal for this speech.

   The defendants begin their position by referencing to *Garcetti v. Ceballos*, 547 U.S. 410 (2006) for the proposition that because the parties did not factually dispute that Garcetti's report of police misconduct was made pursuant his ordinary job duties, his § 1983 claim as it relates to that speech must fail. However, the very premise upon which that argument is based is clearly not applicable to Crystal's claim, as – unlike in *Garcetti* – the parties in this matter do *not* factually agree that Crystal reported the incident within his job duties.

The Supreme Court stressed in *Garcetti* that:

> **the parties in [the *Garcetti*] case do not dispute** that [the plaintiff] wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework of the scope of an employee's duties in cases where there is room for serious debate.

*Garcetti* at 424. In contrast to the *Garcetti* case, *Andrew v. Clark*, 561 F.3d 261 (4th Cir. 2009) involved a disputed question of fact between the parties as to whether the officer in that case, Andrew, had prepared the at issue memorandum as part of his official duties. In reflecting upon the defendants' motion which argued that the memorandum was written as part of Andrew's job

duties, the Fourth Circuit explained that dismissal of the claim was not appropriate:  "In this matter, Andrew has alleged that the preparation of his memorandum was *not* part of his official duties.  At this stage of the proceedings, the district court was required to accept that statement as true."  *See id.* at 268 (emphasis added).

On the night of the incident, Crystal knew he had to report the other officers' criminal conduct, but initially he was unsure of who to report to since it was Crystal's supervisor was the one who Crystal saw commit the crime.  As Crystal explains, during his time on the BPD he only received one class on ethics in the police academy and an Internal Affairs ("IID") briefing that was approximately one (1) hour where the IID's role in the BPD was discussed.  *See* **"Exhibit 1."**  He received one class that lasted approximately two and half hours that was listed as an ethics seminar taught by instructor Hicks.  *See id.*  During this class, it was taught that if officers saw something that they believed was wrong they were to report it to their supervisor.  *See id.*  The course gave an example of this, but did not explain what to do if it was the officer's supervisor who done the wrong, or if the supervisor to whom the incident was reported to told the reporting officer to keep his mouth shut.  *See id.*  There was no General Order which explained the specifics of how to report wrongdoings.[6]  *See id.*

Crystal thus decided to call defendant Sgt. Amador since he was a supervisor in the same division that he was working in.  *See id.*  That same night, Crystal reported to Sgt. Amador what happened and asked Amador if he needed to do anything else to report the incident.  *See id.*  Sgt. Amador instructed him to keep his mouth shut, and warned him that if Crystal talked to Internal Affairs or anyone else he would be labeled a snitch and his career would be over.  *See* Exhibit 1.

---

[6]      By comparison, an officer is to <u>immediately</u> notify his **supervisor** when the officer uses "reportable force."  *See* General Order K-15 at page 1 (underlined emphasis in original and bold emphasis added).

Sgt. Amador further said that, should Internal Affairs speak with him to tell them what Crystal did during the incident, but not to say what Crystal heard because they could not prove it.  *See id.*

Despite Crystal's reporting of the incident to a supervisor, Sgt. Amador instructed Crystal to keep his mouth shut and did not order him to submit any further report of the incident.  *See id.*

Crystal spoke to Sgt. Amador because he was a Sergeant in the BPD within Crystal's division and Crystal believed that, with a BPD supervisor telling him to keep his mouth shut, that the BPD wanted the incident to be kept quiet.  *See id.*  At that point, Crystal did not know how he could report the incident as a police officer.  *See id.*

About a week later, acting outside his job duties, Crystal acted as a concerned citizen and made arrangements while not on duty to meet on a Sunday with a State's Attorney in the narcotics division that his wife and Crystal were friends with, for the purpose of reporting to her what Crystal observed so that something would be done about this serious matter.  *See id.* Crystal also reported at this time the response he had received from Sgt. Amador.  *See id.*  In addition to doing this while he was off of work and on his own time, Crystal believed he was doing this outside his official work duties and as a concerned citizen.  *See* Exhibit 1.

Crystal believed that he had already reported the incident as a police officer and now was reporting the criminal conduct of the fellow officers as a concerned citizen.  *See id.*  This was also the only way that Crystal could think of to report the incident since the training given to him at the police academy did not specify how to report an incident like this, and when such reporting was met with such an instruction.  *See id.*

The Ninth Circuit in *Dahlia v. Rodriguez*, 735 F.3d 1060 (2013) noted that, particularly in a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties.  *See Dahlia* at

1074.  When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties.  *See id.*

The Fifth Circuit has also noted that "[when] however a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen."  *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008).

Defendants also have added to the record General Order C-2 for the proposition that it allegedly clearly shows that it was Crystal's job duty to report the misconduct to the State's Attorney.  The argument fails, however, because Crystal's reporting to the State's Attorney -- and beyond his supervisor and his chain of command -- was performed as a concerned citizen and outside his job or, at a minimum, the facts surrounding this event are material facts in dispute that prevent summary judgment.

First, the defendants' reliance is misplaced that it is "common sense" that General Order C-2 indicates that reporting the misconduct to the State's Attorney falls within its wording.  What General Order C-2 clearly states is that "Members are required to report . . . in accordance with *established procedures.*" [7] (emphasis added).

The reported misconduct in *Hamilton v. Mayor & City Council of Baltimore,* 807 F. Supp. 2d 331 (D. Md. 2011) was given to the Internal Affairs Division of the BPD, however, Crystal's Complaint makes clear that the protected speech upon which he was retaliated against by the defendants was reporting to the State's Attorney -- and not his supervisors or in the chain of command.  *See* Complaint at ¶ 20.  The Complaint further alleges that attempts were made to

---

[7]     The defendants also attached General Order K-2 which, by comparison, provides that an officer is to <u>immediately</u> notify his **supervisor** when the officer uses "reportable force."  *See* General Order K-15 at page 1 (underlined emphasis in original and bold emphasis added).

"cover up" the alleged criminal misconduct and that, due to the inaction of the BPD, Crystal reported the assault to the State's Attorney.  *See id.* at ¶ 23.

Indeed, Crystal was in a situation where, despite his training by the BPD to report misconduct to his supervisor, Sgt. Gialamas, it was that same supervisor who was the subject of the misconduct.  Crystal thus first reported the incident to another supervisor within his same division, defendant Sgt. Amador, however, Sgt. Amador instructed him as a supervisor to keep quiet.  At that point, Crystal, acting as a concerned citizen, then went outside his chain of command and the BPD, and sought out a State's Attorney working in the narcotics division to report the criminal misconduct.  Crystal reasonably believed he had to go outside his regular duties, otherwise the incident would have never come to light.

The cases relied upon by defendants for the factual proposition that Crystal was reporting to the State's Attorney pursuant to his job duties in the First Amendment analysis context are easily distinguishable.  Defendants point to the Seventh Circuit case of *Morales v. Jones*, 494 F.3d 590, 597 (7th Cir. 2007) which found that Morales' speech was not protected under the First Amendment.  The facts of *Morales*, however, are quite different than Crystal's:  (1) Morales met and conversed with the assistant district attorney (A.D.A.) in his capacity as a Vice Control Division VCD officer and *pursuant to his duty to assist the A.D.A. in the proper presentation of charges by providing him with the arrest reports and details of his investigation*; (2) provided the A.D.A. with the information against his Chief and Deputy Chief *in response to the A.D.A's inquiry into the missing page of the subject report*; (3) Morales did *not* meet with the A.D.A. *on his own time*; (4) Morales' speech *concerned a case that he was assigned to investigate.  See id.*

Defendants also point to *Hamilton, supra,* which, *inter alia*, ruled that an officer's reporting to Internal Affairs that overtime slips were allegedly falsified by fellow police officers

was performed under a duty and not as a citizen, thereby barring Hamilton's claim.  Part of the

analysis of the Court's ruling was General Order C-2, which the defendants also rely upon here.

*Hamilton's* facts are easily distinguishable on the facts to Crystal's claim, as is the analysis and

application of General Order C-2.[8]  Discovery has not begun but Crystal's allegations alone

make *Hamilton* inapposite because Crystal has alleged that he only went to the State's Attorney

after the defendants failed to act and attempted to "cover up" the criminal conduct of the officers.

Again, discovery has not yet begun, but it is clear that this issue involves material facts in dispute

based upon Crystal's declaration at this stage of the proceeding.  *See* Exhibit 1.

The other cases relied upon by the defendants are further distinguishable.  It is notable

that the defendants have not offered any evidence in their motions that BPD officers had any

regular interaction with State's Attorneys in the narcotics division for the purpose of

investigating and enforcing the subject criminal police misconduct that occurred in the incident,

and no evidence of any BPD policy, practice or protocol suggesting that BPD officers should or

request narcotics State's Attorneys to investigate such crimes generally or under specific

circumstances.  The defendants have also not pointed to any Order or elsewhere which imposes

such a specific duty on its officers.

---

[8]    In *Hamilton*, the court stated that "[t]he BPD's General Order C-2 required plaintiff to report misconduct <u>within the chain of command</u>."  *Hamilton*, 807 F. Supp. at 351 (emphasis added).  The Plaintiff fulfilled any duty that he may have had under C-2 when he reported to Sgt. Gialamas.  However, the Defendants' attempt to convert a perceived ambiguity in General Order C-2 and include the Baltimore City State's Attorney's office under the umbrella of "chain of command"/"established procedures" belies common sense.  Indeed, the majority of the cases relied upon by the Defendant involve reporting either to an officer's direct superiors or to police internal affairs.  None of the cases involved *ad hoc* reporting misconduct to other entities.  *See Spalding v. City of Chicago*, 2014 WL 917274 at * 6 (N.D. Ill. 2014).  ("If the employee reports misconduct in the manner directed by official policy, to a supervisor, or to an external body with formal oversight responsibility, then the employee speaks pursuant to her official duties and her speech is unprotected. By contrast, if the employee testifies regarding misconduct to a jury or grand jury or reports misconduct outside established channels or in violation of official policy, she speaks as a private citizen and her speech is constitutionally protected.") (citations omitted).

In *Andrew v. Clark*, *supra,* the Fourth Circuit reversed the dismissal under Rule 12(b)(6) of the police officer's § 1983 First Amendment retaliation claim because "the question whether the [plaintiff's internal memorandum that he released to the press] . . . was written as part of his official duties was a disputed issue of material fact." *Andrew,* 561 F.3d at 267.

In this case, the plaintiff does *not* agree that the facts demonstrate that Crystal reported the police misconduct as part of his official duties, and indeed the plaintiff alleged in the Complaint that that he performed this speech as a concerned citizen and outside his official job duties. *See, e.g.,* Complaint at ¶¶ 15, 64-66, 69. Thus, while it is the plaintiff's position that Crystal's speech is protected under the First Amendment, in the event there is any pause that it is not then, at this stage of the proceedings in this matter, the Court must at a minimum conclude that there is "room for serious debate" regarding whether Crystal had an official responsibility to report his fellow officers' misconduct to the State's Attorney.

Moreover, given the disputed facts regarding the nature of Crystal's speech as highlighted above, and the lack of a developed record at this stage in the proceedings, the Court should deny the defendant's motion for summary judgment.

## 2. Crystal's Testimony at the Criminal Trial of the Incident was Speech Protected Under the First Amendment

The Complaint alleges that Crystal testified as a concerned citizen and pursuant to a subpoena to testify under oath of the crimes and delinquent acts he observed at the criminal trials of Sgt. Gialmas and Officer Williams in February 2014. *See* Complaint at ¶ 65. In their motions, the defendants submit that when Crystal testified at the criminal trials of Sgt. Gialamas and Off. Williams, Crystal was doing so as part of his job and therefore was not engaging in citizen speech under the First Amendment. *See* Def. Batts Mot. at 13; Def. Amador's Mot. at 11. In support of this argument, the defendants have submitted General Orders of the various

potential disciplines that an officer may be submitted to.  General Order R-11 provides that failure to appear for a scheduled court appearance *can* result in discipline.  *See also* Def. BPD's Mot. at 6 (stating same).

Of course the allegations in the Complaint clearly show that the defendants wished to "shut up" Crystal, and engaged in a pervasive pattern of retaliation and pressure to get him to stop cooperating with the State's Attorney and not to testify as State's witness.  This retaliation was condoned and allowed to continue by the BPD.  It is therefore a curious argument for the defendants to suggest that Crystal on the one hand was "required by his job duties to testify" and on the other hand were harassing and pressuring him at his job to not do so.

Crystal reasonably believed that he was acting as a concerned citizen and not in performance of his job duties when he appeared in response to a subpoena to testify at the joint criminal trial of Sgt. Marinos Gialamas and Ofc. Anthony Williams in the Baltimore City Circuit Court.  During the time both before, and after his testimony, he was threatened, harassed and experienced retaliation for his testimony by the defendants to this action.  *See* Exhibit 1.  Thus, when the allegations of the Complaint are read in a light most favorable to the plaintiff there is a material fact in dispute as to this issue, which may be borne out further by discovery but which ultimately is likely a question for the jury.  See Declaration of Counsel, attached hereto as **"Exhibit 2."**

In *Schneider v. City of Denver*, 2002 WL 193 1938583, 47 Fed. Appx. 517, 520 (10th Cir. 2002), the Tenth Circuit held that a police officer's testimony was protected where he was retaliated against because he testified at a civil service personnel hearing. The case was on appeal from Officer Schneider's verdict because of a retaliatory transfer.  Officer Schneider testified about one of the Police Department's training programs and testified against the department.

16

In *Kinney v. Weaver*, 301 F.3d 253 (5th Cir. 2002), police officers initiated First Amendment claims alleging retaliation because of their testimony. The Fifth Circuit held that the officers' right not to be retaliated against for testifying was clearly established. The Court explained:

> There is no question Kinney's and Hall's testimony in the Kerville case is speech protected by the First Amendment. Testimony in judicial proceedings is inherently of public concern . . . .  Moreover, the testimony at issue in the instant case is of public concern not only because of its context, but also because its subject matter - i.e., the use of excessive force by police officers.

In *Tindal v. Montgomery*, 32 F.3d 1535 (11th Cir. 1994), the Eleventh Circuit held that testimony was protected.  Officer Tindal testified as a witness in a personnel trial regarding "the working environment in the Sheriff's office."  *Id.* at 1537.  Tindall's testimony was on behalf of a co-worker.  *Id.*  at 1541.  The Court also denied qualified immunity because the constitutional right to testify without retaliation was clearly established, as other cases have held.

In *Miller v. Kennard*, 74 F. Supp. 2d 1050 (D. Utah. 1999), a police officer initiated a First Amendment claim alleging that he was retaliated against because of his testimony. The Court concluded that the testimony was protected and that it was clearly established that a police officer's testimony constituted protected speech; therefore the Court denied qualified immunity. In *Lynch v. City*, 166 F. Supp. 2d 224 (E.D. Pa. 2001), a police officer initiated a First Amendment challenge to punishment because of testimony.  The Court concluded that the officer's testimony constituted protected speech.

In *Dahm v. Flynn*, 60 F.3d 253 (7th Cir. 1994), the Court found that testimony before a legislative body regarding employee morale was protected.  In *Shehee v. City of Wilmington*, 205 F. Supp. 2d 269 (D. Del. 2002), *aff'd in pertinent part*, 2003 WL 21061233 (3d Cir. 2003), the Court held that deposition testimony constituted protected expression.  In *Tate v. Yenoir*, 537 F.

Supp. 306 (E.D. Mich. 1982), the Court held that a law enforcement officer stated a First

Amendment claim where he was punished as a result of his testimony and reasoned:

> to hold otherwise would place a judicial imprimatur on the intolerable
> occurrence of allowing a witness' testimony to be compromised out of fear
> of what that witness' employer may think or do.

Crystal asserts that his speech – reporting to the State's Attorney, cooperating and testifying for

the State in the criminal trials, and speaking to the media – are all inter-related just as is the

retaliation that was asserted levied against him by the defendants.

Thus, at this stage of the proceedings, the Court should deny the defendants' motions to

dismiss or for summary judgment.

### 3.    Crystal's Speech to the Media was Protected Under the First Amendment

Another issue which the Fourth Circuit examined in *Andrew* was whether Andrew's

delivery of his memorandum to a reporter for the *Baltimore Sun* "addresses a matter of public

concern must be determined by the content, form, and context of a given statement, *as revealed

by the whole record.*"  *Andrew*, 561 F.3d at 268.  Only if the speech is found to address a matter

of public concern does the court then "seek 'a balance between the interests of the employee, as a

citizen, in commenting upon matters of public concern and the interest of the State, as an

employer, in promoting the efficiency of the public services it performs through its employees.'"

*Id*.  The Fourth Circuit went on to explain that the *resolution of these questions will depend upon

the results of discovery* as tested by a motion for summary judgment.  *Id.*

Additional discovery is required from discovery and the whole record concerning the

facts surrounding Crystal's speaking to the media and the actions, conduct and retaliation

surrounding those events by the defendants.  *See* **"Exhibit 2."**

**B.      Defendants Comm. Batts and Sgt. Amador Do Not Enjoy Qualified Immunity when the Allegations of the Complaint Are Read in a Light Most Favorable to the Plaintiff**

Defendant Comm. Batts and Sgt. Amador have also argued, in the alternative, that if there is a *prima facie* showing of speech that is protected under the First Amendment, then Comm. Batts and Sgt. Amador as government officials enjoy qualified immunity from suit.  Def. Batts' Mot. at 16-18; Def. Amador's Mot. at 13-14.  However, the case upon which the defendants point to for support of their position, *Lane v. Franks*, 134 Sup.Ct. 2369 (2014),[9] clearly distinguishes that the issue whether an employee's testimony in proceedings unrelated to his job duties was not clearly established at that time.  *See id.*

Section 1983 creates liability for any person, acting under color of state law, who violates the Constitution and laws of the United States. The statute references no exceptions to this liability. Thus, by its terms, § 1983 seems to permit lawsuits (and recovery of damages) from state officials who violate federal law. The Supreme Court has recognized, however, "the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion."  *Scheuer v. Rhodes*, 416 U.S. 232, 240 (1974).

Qualified immunity shields federal and state officials from money damages unless a plaintiff establishes:  (1) that the official violated a statutory or constitutional right and (2) that right was "clearly established" at the time of the challenged conduct.  *See id.*; *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In the instant motions, the defendants do not challenge the first prong of this analysis, and instead focus on the second prong that Crystal's reporting of the

---

[9]      The defendants concede when referencing *Lane* that the Supreme Court held in that case that an employee testifying *outside* of his official job duties was protected by the First Amendment.  Def. Mot. at 17; *see Lane v. Franks*, 134 Supt. Ct. 2369 (2014).

incident was not so clear as to deprive the defendants of qualified immunity.  *See* Def. Batts'

Mot. at 18; Def. Amador's Mot. at 14.  The defendants make their arguments as part of their

motions to dismiss, and not as summary judgment.

Asserting a qualified immunity defense in a Rule 12(b)(6) motion "subjects the defendant

to a more challenging standard of review than would apply on summary judgment."  *Thomas v.*

*Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201

(10th Cir. 2004)).  This is so because at the motion to dismiss stage, the Court scrutinizes

defendants' conduct as alleged in the complaint for "objective legal reasonableness."  *Behrens v.*

*Pelletier*, 516 U.S. 299, 309 (1996).

The retaliation against Crystal for his speech protected under the First Amendment that is

alleged in the Complaint follows the October 27, 2011 incident.  Importantly, the Fourth Circuit,

in affirming a $1.1 million jury award in favor of a deputy sheriff's claim of retaliation ruled

that:

> In short, **it was clearly established in the law of this Circuit in September 2009
> that an employee's speech about serious governmental misconduct, and
> certainly not least of all serious misconduct in a law enforcement agency**, *see*
> *Andrew v. Clark*, 561 F.3d 261, 269 (4th Cir. 2009) **is protected.**

*Durham v. Jones*, 737 F.3d 291 (4th Cir. 2013) (emphasis added).  The Fourth Circuit rejected

defendant/appellant Sheriff Robert Jones' argument that Durham's First Amendment rights were

not clearly established because there was not a bright line rule to address Durham's situation and

that there was "scant guidance on the boundaries of public employee speech rights" in the Fourth

Circuit.  In the instant matter, defendants Comm. Batts and Sgt. Amador make a similar

argument and go on to also cite *Andrew v. Clark*, *supra*, for that position, although it is clear

from *Durham* (and itself referring to *Andrew v. Clark*) that "[The Fourth Circuit] has been clear

that where public employees are speaking out on government misconduct, their speech warrants

protection." *Durham*, 737 F.3d at 303.  Just as in *Durham*, the incidents at issue here rise far above an ordinary workplace dispute, and "the use of coercion and threats against him as shown in this record and accepted as accurate by the jury goes far beyond the permissible bounds." *Id.* at 302.[10]

Defendant Comm. Batts is alleged throughout the Complaint to have had personal interaction with Crystal, others and the media related to the retaliation against him.  *See, e.g.,* Complaint at ¶¶ 42, 54, 56, 62.  Defendant Sgt. Amador is alleged throughout the Complaint to have had personal interaction with Crystal and others related to the retaliation against him.  *See, e.g.,* Complaint at ¶¶ 28, 33, 45, 46, 52.

Moreover, given the infancy stage of this proceeding, additional interactions and acts by defendants Comm. Batts and Sgt. Amador regarding the alleged retaliation will likely come to light in discovery.  *See* **"Exhibit 2."**  But at this stage of the proceeding, for the purposes of reviewing defendants Commn. Batts and Sgt. Amador's motions to dismiss as to whether they should enjoy qualified immunity, based upon the Fourth Circuit's case of *Andrew*, and ruling in *Durham,* these defendants were clearly on notice that Crystal's speech was protected under the First Amendment, and the Court should deny the defendants' motions.

---

[10]     Durham accused several high-ranking law enforcement officials of falsifying law enforcement reports and with authorizing aggressive threats against a member of their own agency if he persisted in his opposition to such practice.  *See Durham, supra.*  The Fourth Circuit, with the benefit of a full record and trial, explained that the use of coercion and threats against Durham, as shown in this record and accepted as accurate by the jury went far beyond an ordinary workplace dispute.  *See id.*

**C.**     **Defendants BPD and Comm. Batts are Not Entitled to Dismissal of the Plaintiff's Count II (Maryland Declaration of Rights Claims) Because Article 40 is Read *in pare materia* with the First Amendment and Therefore Crystal's Speech is Protected.**

In their motions, defendants submit that Count II of the Complaint, predicated upon Article 40 of the Maryland Declaration of Rights, is read in *pare* material with the First Amendment of the United States Constitution and therefore the defendants incorporate their arguments as they pertain to the First Amendment speech issue.  *See* Def. Batts and BPD's Mot. at pages 18-19; Def. Amador's Mot. at 6-5.  The plaintiff similarly incorporates by reference his arguments throughout this opposition in countenance to the defendants' positions, and request that the Court deny the defendants' motions to dismiss or for summary judgment as to Count II of the Complaint.

**D.**     **Defendant BPD is a Proper Defendant for Plaintiff's Count III for Unpaid Wages and Hours Claims**

Defendant BPD argues in its motion that, because the term "employer" is defined under the Md. Lab. and Empl. Art., Maryland Code §3–501 for the subtitle Maryland Wage Payment Collection Act (the "WPCA") as "any *person* who employs an individual in the state or a successor of that person" that the government employers (such as BPD) are not subject to the WPCA.  However, the general definitions for the Labor and Employment article, at Md. Lab. and Empl. Art., Maryland Code § 1-101 (2014), states:

§1-101. Definitions

(a) In this article the following words have the meanings indicated.

\*        \*        \*

(d) "Person" means an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, association, corporation, or other entity.

(emphasis added).  This definition of "person" is applicable to the entire Labor and

Employment article – including the WPCA subsection – and thus expands the application

of §3–501 and the applicability of the WPCA to defendant BPD as the entity that

employed the individual at issue, Crystal.

The BPD does not cite any case law on point for its position, but instead provides an

Internet hyperlink to the Maryland Department of Labor and Licensing Regulation's website.

Def. Batts' Mot. at pages 22.  Assuming, *arguendo*, that such authority is enough to persuade the

Court at this stage of the proceeding that defendant BPD is correct that it is not subject to

Maryland wage and hour law, although it remains plaintiff's position that the BPD has not met

its burden of showing that it not subject to the WPCA, then and in that event plaintiff

respectfully moves to amend the Complaint to add a claim against defendant BPD for his unpaid

wage and hour claims under the federal Fair Labor Standards Act.[11]  The plaintiff would also in

that event request that the Court dismiss Count III without prejudice to allow plaintiff to refile in

the event the BPD later takes the position that it is also not subject to the federal Fair Labor

Standards Act.

> **E.     The Court at this Time Should Not Dismiss Count II (Freedom of Speech
> Retaliation - Maryland Declaration of Rights Article 40) against defendant
> Amador because of the Local Government Tort Claims Act**

At this point of the proceeding, when reading the allegations in the Complaint as truthful

and in a light most favorable to the plaintiff, there is are open factual issues that cannot be

decided at this stage of the proceeding that prevent Amador's motion to dismiss Count II against

---

[11]     Defendant Batts' motion cites to the Maryland Department of Labor and Licensing
Regulation website at http://www.dllr.state.md.us/labor/wagepay/wpgenl.shtml in support of its
argument.  The portion of the website that defendant BPD omits from its motion states:  "*
Federal, state and local governments are exempt from the provisions of both the Wage Payment
and Collection Law and the Wage and Hour Law, **but they must comply with the federal Fair
Labor Standards Act.**"  (emphasis added).

him.  Indeed, there are open factual issues as to whether Amador's conduct as alleged in the

Complaint were performed in, or outside, the scope of his employment, or whether Sgt.

Amador's actions were performed with malice.

When read as truthful and in a light most favorable to the plaintiff, the Complaint alleges

threats, retaliation, and harassment by Sgt. Amador in response to Crystal's protected speech

both during work hours and not:

1.  Plaintiff received a disturbing phone call from defendant Amador. plaintiff's wife witnessed the statements uttered by defendant Amador, including but not limited to defendant Amador yelling, "You better pray to God you are not the star witness, because your career is already fucked, but if you're the star witness you may as well just resign." defendant Amador also stated that plaintiff, "did not have to lie but he did not have to bury the motherfucker. You better pray you are not the star witness against 'G'."  *See* Complaint at ¶ 28.

2.  Plaintiff received a telephone call from defendant Amador to pick up a Confidential Informant ("CI") Slip at headquarters that had been filed regarding a Controlled Narcotics purchase that occurred on or about September 29, 2012 and to bring it to him at the Western District. The reason for defendant Amador's request was because he wanted plaintiff to change the date on the CI slip from the actual date of the purchase, September 29, 2012, to a date after October 4, 2012, which would have created a fraudulent report.  *See* Complaint at ¶ 33.

3.  Defendant Amador ordered plaintiff to perform a Confidential Informant Narcotics buy and part of his order was to make plaintiff use his own personal money because there was no money allotted by the Baltimore City Police for this operation. defendant Amador promised to reimburse plaintiff for the advanced monies for the successful purchase, and while he initially did, after plaintiff refused to now falsify the CI slip -- stating that he would rather explain what occurred than alter the official record – Amador demanded that plaintiff give to him $100 and then threatened that he would charge him departmentally if plaintiff continued to refuse to alter the document. Because of defendant Amador's threat, plaintiff gave him $100, however, plaintiff nevertheless again refused to falsify the document, and reasonably believed that the defendant Baltimore City Police Department was trying to set him up with altering the police voucher. The Department never reimbursed plaintiff after he reported this incident.  *See* Complaint at ¶ 34.

4.  Defendant Amador directly threatened the plaintiff and on or about October 9, 2012, he stated to plaintiff, "People don't like you and you need to watch your back." plaintiff took this statement as a direct threat of physical harm and feared for his safety.  *See* Complaint at ¶ 45.

5.   Another incident of direct harassment when defendant Amador telephoned plaintiff on multiple occasions so as to harass plaintiff. Specifically, defendant Amador would say that plaintiff had "snitched to Internal Affairs" and now the Prosecutors are "talking about jail time."  *See* Complaint at ¶ 46.

6.   Defendant Amador at one point ordered plaintiff to turn in his Detective badge and identification card, and obtain instead a new Officer identification card because plaintiff would no longer be a Detective.  Defendant Amador further said he was ordering him to appear first thing Monday morning to get an Officer's badge, as ordered by his supervisor. plaintiff had been off work at this time for his wedding anniversary. When plaintiff went to the Quartermaster the next Monday as ordered, however, the Quartermaster advised plaintiff that he would not perform the demotion as defendant Amador had not submitted a proper transfer order.  *See* Complaint at ¶ 52.

Before the Court is also the Declaration of Crystal which has alleged the following

conduct by Sgt. Amador:

7.   Crystal reported the incident to Sgt. Amador and asked Amador if he needed to do anything else to report the incident.  *See* Exhibit 1.  Sgt. Amador instructed him to keep his mouth shut, and warned him that if Crystal talked to Internal Affairs or anyone else he would be labeled a snitch and his career would be over.  Exhibit 1.  Sgt. Amador further said that, should internal Affairs speak with him to tell them what Crystal did during the incident, to not say what Crystal heard because they could not prove it.  *Id.*

8.   Despite Crystal's reporting to supervisor Sgt. Amador the excessive force of the incident, and despite General Order K-15, Sgt. Amador instructed Crystal to keep his mouth shut and did not order him to submit any further report of the incident.  *Id.*

9.   Crystal spoke to Sgt. Amador because he was a Sergeant in the BPD within Crystal's division and Crystal believed that, with a BPD supervisor telling him to keep his mouth shut, that the BPD wanted the incident to be kept quiet.  *Id.* At that point, Crystal did not know how he could report the incident as a police officer.  *Id.*

Thus, there is an open factual issue as to whether Sgt. Amador was acting within or outside the

scope of employment when he violated Crystal's speech protected under Maryland's Declaration

of Rights Article 40.[12]  Following discovery, if there are sufficient materials facts not in dispute,

or if the jury determines following trial that Sgt. Amador was acting within the scope of his

employment, *i.e.*, "the conduct of [Amador] . . . was of a kind the actor is employed to perform,

occur[ed] during a period not unreasonably disconnected from the authorized period of

employment, in a locality not unreasonably distant from the authorized area, actuated at least in

part by a purpose to serve the [BPD]," then and in that event perhaps Amador would enjoy

immunity under the Local Government Tort Claim Act.  Of course, were such a finding of fact to

be made, then and in that event the BPD would be responsible for the wrongful conduct of Sgt.

Amador in relation to the violations of Crystal's free speech protected under the Maryland

Declaration of Rights Article 40.

Furthermore, if a fact finder instead determines that Sgt. Amador acted with malice, then

and in that event he will not enjoy any form of immunity.  *See Houghton v. Forrest*, 989 A.2d,

223 (Md. 2010).

Lastly, defendant BPD has not asserted in its motions to dismiss or summary judgment

that the Maryland Local Government Tort Claims Act prevents it from being sued for violation

of Crystal's speech protected under the Maryland Declaration of Rights Article 40.

At this stage of the proceeding, defendant Sgt. Amador's motion to dismiss Count II

should be denied.

---

[12]     It should further be noted that the rationale behind the notice requirement of the Local
Government Tort Claims Act has not been offended in the instant matter:  The defendants have
been able to conduct their own investigation into the relevant facts, while evidence and the
recollection of witnesses are still fresh.  *See Smith v. Danielczyk*, 923 A.2d 795, 804 (Md. 2007)
(citations omitted).  The Complaint alleges, *inter alia*, that an Internal Affairs investigation was
opened into Crystal's retaliation complaint, Affairs Division, Comm. Batts, opened an
investigation into the retaliation complaints of Crystal, that Crystal provided a copy of his
journal to Internal Affairs.  *See*, *e.g.*, Complaint at ¶ 37.  Defendants also do not assert that an
Internal Affairs investigation was not conducted.

**V.**     **Conclusion**

For the foregoing reasons, plaintiff Joseph Crystal hereby requests that the Court deny the

defendants' Motions to Dismiss or for Summary Judgment.


Respectfully submitted,

   /S/ A. Donald C. Discepolo
A. Donald C. Discepolo
Federal Bar No. 25525
don@discepolollp.com
Alan B. Neurick
Federal Bar No. 14607
alan@discepolollp.com
Discepolo LLP
111 South Calvert Street
Suite 1950
Baltimore, Maryland 21202
Telephone: (410) 296-0780
Fax: (410) 296-2263
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of April 2015, a copy of the foregoing plaintiff's omnibus opposition to defendants Anthony W. Batts and Baltimore Police Department's motion to dismiss or, in the alternative, for summary judgment, and Defendant Robert Amador's motion to dismiss, and supporting memorandum of law with exhibits, was sent via the electronic court filing system to:

> Colin P. Glynn, Esq.
> Assistant Solicitor
> Baltimore City Department of Law
> City Hall, Room 01
> Baltimore, MD  21202
> *Attorneys for Defendants Baltimore Police Department and Anthony W. Batts*
>
> Neil E. Duke, Esq.
> Ober, Kaler, Grimes & Shriver
> 100 Light Street
> Baltimore, MD  21202
> *Attorneys for Defendant Robert Amador*


        /S/ A. Donald C. Discepolo
        A. Donald C. Discepolo