## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JOSEPH CRYSTAL** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO. JKB-14-3989** |
| **ANTHONY W. BATTS,** *et al.* | * | |
| **Defendants** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM</u>

### *I. Background*

This action was brought by Plaintiff Joseph Crystal against Police Commissioner Anthony Batts, Sergeant Robert Amador, and the Baltimore City Police Department ("BPD" or the "Department") alleging First Amendment retaliation (Count I), free speech retaliation under the Maryland Declaration of Rights (Count II), violation of the Maryland Wage and Hour Law (Count III), and constructive discharge (Count IV). Crystal seeks nominal, compensatory, and punitive damages as well as attorney's fees. (Compl., ECF No. 1.)

Now before the Court are Amador's motion to dismiss for failure to state a claim and Defendants Batts and BPD's motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. (ECF Nos. 15 & 16.) The issues have been briefed (ECF Nos. 15, 16, 23, 28-32), and no hearing is required, Local Rule 105.6 (D. Md. 2014). For reasons explained below, Amador's motion will be granted in part and denied in part, and Batts and BPD's motion will be construed as a motion to dismiss and granted in part and denied in part. The Court declines to treat the latter motion as one for summary judgment.

## *II. Standard of Dismissal for Failure to State a Claim*

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). This analysis involves "'[t]wo working principles.'" *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "First, although a court must accept as true all factual allegations contained in a complaint, such deference is not accorded to legal conclusions stated therein." *Id.* Therefore, "[t]he mere recital of [the] elements of a cause of action, supported only by conclusory statements, is not sufficient . . . ." *Id.* "Second, to survive such a motion, a complaint must state a 'plausible claim for relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). Plausibility means "that the factual allegations in the complaint are 'enough to raise a right to relief above the speculative level[.]'" *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007)). This is a "'context-specific task'" that allows the court "'to draw on its judicial experience and common sense.'" *Vitol, S.A. v. Primerose Shipping Co. Ltd.*, 708 F.3d 527, 543 (4th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679).

If in resolving this inquiry, however, a district court considers matters outside the pleadings, then "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "Either the pleader or the moving party or both may bring the conversion provision into operation by submitting matter that is outside the challenged pleading, as courts in every circuit have recognized." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (3d ed. 2004). This does not mean, however, that the court *must* initiate the conversion when outside matters have been introduced. "Federal courts have complete discretion to determine whether or not to accept the submission of any material beyond the

pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." *Id.*

A court may take judicial notice of certain matters outside the pleadings without converting the motion to one for summary judgment. *See, e.g.*, Fed. R. of Evid. 201(b); Wright & Miller, *supra*, § 1364. "[R]ules and regulations duly promulgated by the chief of police . . . upon approval by the [city] . . . and published for use in the normal course of business by the . . . Police Department" may be judicially noticed. *Driebel v. City of Milwaukee*, 298 F.3d 622, 630 n.2 (7th Cir. 2002).

### III. Allegations of the Complaint

Crystal was a police officer with BPD from November 2008 until his resignation on September 3, 2014.  (Compl. ¶¶ 9, 60.)  Before the events that led to his resignation, Crystal was considered to be a rising star within the Department and was beyond reproach.  (*Id.* ¶ 14.)  The circumstances that led to this suit began in October of 2010 when Crystal was promoted from Officer to Detective (*id.* ¶ 12) and was assigned to Violent Crime Impact Section ("VCIS") Westside (*id.* ¶¶ 12-13).

On or about October 27, 2011, while on assignment with VCIS Westside, Crystal and other officers observed Antoine Green participating in a suspected drug transaction.  (*Id.* ¶¶ 13, 16.)  They chased Green to an alleyway where he had broken down a door during his attempted escape.  (*Id.* ¶ 17.)  The door was part of a home belonging to the girlfriend of Officer Anthony Williams.  (*Id.*)  Green was eventually placed into custody and was on his way to central booking for processing, but was diverted when Sergeant Marinos Gialamas called for the van to return to the house.  (*Id.*)  Upon the van's return, Gialamas and Williams physically assaulted Green.  (*Id.*)  Crystal reported this assault to the State's Attorney's Office.  (*Id.* ¶¶ 20, 64.)  Crystal felt that

Gialamas, Williams, and other officers within the Department were attempting to "cover up" the incident (*id.* ¶ 22) and he was compelled to report it because no one else was willing to do so (*id.* ¶ 21). Pursuant to subpoena, Crystal testified at the February 2014 criminal trials for Gialamas and Williams (*id.* ¶ 65), who were convicted (*id.* ¶¶ 67, 68).

As a result of his report to the State's Attorney's Office, Crystal began to experience harassment and threats from fellow officers within BPD. (*Id.* ¶ 25.) These included being called a "rat" (*id.* ¶¶ 26, 32), receiving disturbing phone calls from Amador (*id.* ¶¶ 28, 46), being pressured to create fraudulent reports (*id.* ¶ 33), and finding a dead rat on his vehicle (*id.* ¶ 48). Crystal also tried to call for backup multiple times and none would come. (*Id.* ¶¶ 50-51.) He was eventually reassigned from VCIS. (*Id.* ¶ 51.)

On or about February 24, 2014, Crystal was invited to meet with Commissioner Batts because Jayne Miller of WBAL had asked to interview Plaintiff. (*Id.* ¶ 54.) Batts allowed Crystal to participate in the interview and promised to investigate Crystal's allegation that he was the victim of retaliation. (*Id.*) Crystal, however, was ordered not to talk about policy. (*Id.*)

On or about March 15, 2014, Crystal began noting difficulties receiving overtime pay. (*Id.* ¶ 55.) He had worked six days in a row and was entitled to overtime, but was denied it even though other officers were receiving it. (*Id.*) Just a few days later, Crystal was also passed over for a new police vehicle and was instructed to wait for a new car until his investigation was resolved. (*Id.* ¶ 56.) After having his security clearance revoked (*id.* ¶ 58), his station constantly changed without guidance on where to report (*id.* ¶¶ 58-59), and continuing retaliation fostered by the Defendants (*id.* ¶ 60), Crystal effectively was forced to resign (*id.*).

*IV. Analysis*

Crystal's first count, which is brought under 42 U.S.C. § 1983, asserts a violation of his right not to suffer retaliation for exercising his right to free speech. (Compl. ¶ 77.) The protection provided by the First Amendment "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union of Md., Inc. v. Wicomico Cnty., Md.*, 999 F.2d 780, 785 (4th Cir. 1993).

To recover on his First Amendment retaliation claim, Crystal must prove three elements: "(1) [he] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). All Defendants dispute the first element, contending Crystal was not engaging in protected First Amendment activity. Also, Amador partially disputes the third element, asserting Crystal has not shown a causal relationship between his testifying and the interview and Amador's alleged retaliation.

The Supreme Court explained the retaliation inquiry as a two-step process. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "The first question is 'whether the employee spoke as a citizen on a matter of public concern. If the answer is no,' First Amendment protections are not implicated." *Hunter v. Town of Mocksville*, 789 F.3d 389, 397 (4th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 418). "If, however, the answer is yes, then we must ask whether the employee's interest in speaking out [as a private citizen] about the matter of public concern outweighed the

government's interest in providing effective service to the public." *Id.* Although framed as a single issue, *Garcetti* modified the first question to introduce a second line of inquiry in addition to the "public concern" requirement. This additional question was whether the employee had made the statement as a citizen, or whether he made it pursuant to his "official duties." *See Garcetti*, 547 U.S. at 421.

In *Garcetti*, Ceballos was a deputy district attorney for the Los Angeles County District Attorney's Office. *Id.* at 413. After determining that an affidavit in a pending criminal case contained serious misrepresentations, Ceballos relayed his findings to his supervisors and recommended dismissing the case in a follow-up memo. *Id.* at 414. He claimed that he was subject to numerous retaliatory employment actions as a result and that his memo provided the foundation for his First Amendment retaliation claim. *Id.* at 415. The Court disagreed, finding that the memo was written "pursuant to his duties as a calendar deputy." *Id.* at 421. Because he "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case," he was "not speaking as [a] citizen[] for First Amendment purposes . . . ." *Id.* Thus, under *Garcetti*, for Crystal's speech to qualify as the foundation for a later First Amendment retaliation claim, it must not only have addressed a matter of public concern but must also have been made by him as a citizen and not pursuant to his official duties as a law enforcement officer.

Like the petitioners in *Garcetti*, Defendants do not dispute the public concern inquiry, nor could they, as speech involving law enforcement misconduct has been held to involve a matter of public concern. *See Durham v. Jones*, 737 F.3d 291, 300 (4th Cir. 2013) (finding "allegations of serious and pervasive law enforcement misconduct" to be matter of public concern). Defendants instead argue that Crystal was speaking as a law enforcement officer pursuant to his official

6

duties when he engaged in his various speech activities, and thus Crystal's First Amendment claim is barred under *Garcetti* because his speech was not protected.  (Def. Amador's Mot. to Dismiss Supp. Mem. 6-13, ECF No. 15; Defs. Batts & BPD's Mot. to Dismiss Supp. Mem. 10-16, ECF No. 16).  *See Garcetti*, 547 U.S. at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

Crystal alleges he engaged in three separate kinds of speech that warrant First Amendment protection.  These are (1) reporting Williams and Gialamas to the Baltimore City State's Attorney's Office (Compl. ¶ 64); (2) testifying at their criminal trials (*id.* ¶ 65); and (3) speaking to the media about the retaliation he experienced because of his speech (*id.* ¶ 69). As these are three different species of potentially protected speech, each requires a separate analysis under *Garcetti*'s "official duties" doctrine to determine if Crystal has failed to state a claim upon which relief may be granted.

### A. *Count I: Reporting to the State's Attorney's Office*

Crystal first claims he experienced retaliation for reporting Williams's and Gialamas's misconduct to the Baltimore City State's Attorney's Office.  (Compl. ¶ 70.)  He alleges he acted as a "concerned citizen" when he reported the misconduct.  (*Id.* ¶ 64.)  Defendants assert Crystal had a duty to report the officers' misconduct because that was his job as a law enforcement officer.  (Def. Amador's Mot. to Dismiss 7-10; Defs. Batts & BPD's Mot. to Dismiss 10-13). Therefore, they argue, Crystal's reporting to the State's Attorney's Office was pursuant to his official duties as a police officer, and his speech was not protected by the First Amendment.  For

the reasons that follow, the Court will deny Defendants' motions to dismiss this portion of Crystal's claim.

The Fourth Circuit recently articulated the framework for *Garcetti*'s "official duties" inquiry in *Hunter v. Town of Mocksville*, 789 F.3d 389. The plaintiffs in *Hunter* were former police officers of the Mocksville Police Department in North Carolina who were allegedly terminated for speaking out against their supervisors. *Id.* at 395. As in the instant case, the *Hunter* defendants' first argument was that the plaintiffs had spoken pursuant to their official duties, and not as citizens, when they had reached out to the Governor's Office and others to expose their supervisors' misconduct. *Id.* at 396. The Court disagreed. *Id.*

In its official duties analysis, the Fourth Circuit emphasized the Supreme Court's instruction to "engage in a 'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those ordinary duties." *Id.* at 397 (quoting *Garcetti*, 547 U.S. at 422, 424). This analysis rejects a focus on "formal job descriptions," preventing employers from "restrict[ing] employees' rights by creating excessively broad job descriptions." *Garcetti*, 547 U.S. at 424. "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014).

The defendants in *Hunter* asserted that the plaintiffs' speech was not protected because "'calling the Governor's Office was pursuant to their official duties . . . . When a police officer reports a crime, he is literally just doing his job.'" *Hunter*, 789 F.3d at 398 (quoting Appellants' Br. at 30). The Fourth Circuit disagreed: "Nothing before us suggests that Plaintiffs' 'daily professional activities' . . . included calling the Governor's Office for any purpose, much less to

express concerns about the Mocksville PD." *Id.* at 399. Therefore, the defendants' argument failed *Garcetti*'s "'practical' inquiry into Plaintiff's day-to-day duties." *Id.*

In this case, BPD has offered evidence of General Departmental Orders to show that Crystal was required to report police misconduct as one of his official duties. (*See* Defs. Batts & BPD's Mot. to Dismiss, Ex. C at 14) ("Members are required to report any acts of misconduct including, but not limited to, discrimination, harassment, criminal conduct, or any other misconduct activity detrimental to the operation of the Department, in accordance with established procedures."). Defendants Batts and BPD argue that the Court may take judicial notice of this order pursuant to Federal Rule of Evidence 201(b). (*Id.* at 8.) The footnote from a Seventh Circuit case cited in support of their argument, however, is distinguishable. (*See id.* ("A federal court may, pursuant to Federal Rule of Evidence 201(b), take judicial notice of the rules and regulations duly promulgated by the Police Commissioner and published for use in the normal course of business of the Baltimore Police Department." (citing *Driebel*, 298 F.3d at 630 n.2))). In *Driebel*, the Milwaukee Police Department Manual was approved by the Common Council of the City of Milwaukee. *See Driebel*, 298 F.3d at 630 n.2. In the instant case, there are no indications that BPD's General Orders were ever approved by the Baltimore City Council. Also, unlike the Milwaukee Police Department's General Orders, BPD's Orders do not appear to be openly published. The Court had no issue finding Milwaukee's procedures through its website,[1] whereas BPD's General Orders were impossible to find via either Baltimore City's website or a Google™ search. Thus, the Court finds no basis for taking judicial notice of the BPD General Orders. Even if the Court were to take notice of these Orders, however, the Department's argument still fails.

---

[1] *See Code of Conduct & Standard Operating Procedures*, OFFICIAL WEBSITE OF THE CITY OF MILWAUKEE, http://city.milwaukee.gov (follow "Police Department" hyperlink under "Directory" tab; then follow "Code of Conduct & Standard Operating Procedures" under "About MPD" tab).

BPD's contention that all police officers are required to report misconduct as part of their official duties is identical to the defendants' claim in *Hunter*, where they had asserted that "[p]laintiffs acted pursuant to their official duties because all sworn police officers have a duty to enforce criminal laws . . . ." *Hunter*, 789 F.3d at 399. After noting that the alleged misconduct could have included both civil and criminal components, the *Hunter* Court stressed the more important point was that "a general duty to enforce criminal laws in the community does not morph calling the Governor's Office because the chief of police himself is engaging in misconduct into part of an officer's daily duties." *Id.* The *Hunter* Court also noted that its reasoning aligned with *Garcetti*'s refusal to focus on "'formal job descriptions,' as well as any 'suggestion that employers [could] restrict employees' rights by creating excessively broad job descriptions.'" *Id.* (quoting *Garcetti*, 547 U.S. at 424). Similarly, BPD's General Orders can be seen as an excessively broad job description within the purview of *Garcetti*'s caution, requiring the Court to make a more practical and specific inquiry into Crystal's day-to-day duties. The controlling question is whether Crystal had an overarching responsibility to report police misconduct to the State's Attorney's Office as part of his official duties as a Detective in VCIS.

In *Garcetti*, the parties had already stipulated that Ceballos was acting within his official duties when he wrote his memo. *See Garcetti*, 547 U.S. at 424 ("[A]s indicated above, the parties in this case do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."). The parties in this case did not cite to, nor could the Court find, any case that directly holds that it is part of an officer's official duties to report crimes to the local prosecutor's office. Thus, a brief survey of what kind of reporting has been held to involve official duties, as well as what

has not, proves helpful in providing context to this case where there is arguably "room for serious debate." *Id.*

When the reporting of police misconduct is done by an officer with the express task of investigating such misconduct, as, for example, an Internal Affairs Officer, the speech is generally pursuant to official duties and has no First Amendment protection. *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013) ("[I]f a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can be reasonably classified as being within the job duties . . . [unless] the employee works for Internal Affairs or another such watchdog unit."), *cert. denied*, 134 S. Ct. 1283 (2014). Also, when the reporting is done in accordance with established internal procedures, such as reporting the misconduct to an Internal Affairs Officer or a supervisor within the "chain of command," the reporting likely involves official duties.  *See id.* at 1074 ("[I]n a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties."); *see also Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 351 (D. Md. 2011) (finding plaintiff officer was speaking pursuant to her official duties when she lodged internal complaint regarding widespread overtime abuse).  In contrast, when an officer clearly goes beyond authorized bounds and disseminates information to outside persons or other public officials, the officer is often found to have spoken as a citizen outside the scope of his official duties.  *See, e.g.*, *Hunter*, 789 F.3d at 399 ("In sum, privately reaching out to the Governor's Office about suspected corruption and misconduct at the Mocksville PD . . . cannot fairly or accurately be portrayed as simply part of Plaintiffs' 'daily professional activities.'"); *Dahlia*, 735 F.3d at 1075 ("[W]e conclude that when

a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties."). The instant case falls somewhere in between, where the State's Attorney's Office is not the standard forum for an officer to lodge a complaint regarding police misconduct, but it is also public knowledge that these prosecutors work closely in partnership with BPD in prosecuting criminal conduct.

At this early stage in the proceedings on a Rule 12(b)(6) motion to dismiss, "room for serious debate" regarding Crystal's official duties as a VCIS Detective exists. As many courts have recognized, this "official duties" analysis is a mixed question of fact and law, and more factual development is necessary before it can be resolved. *See, e.g.*, *Dahlia*, 735 F.3d at 1072 ("'[A]fter *Garcetti* the inquiry into the protected status of speech presents a mixed question of fact and law, and specifically that the question of the scope and content of a plaintiff's job responsibilities is a question of fact.'" (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1130 (9th Cir. 2008))); *Andrew*, 561 F.3d at 267 ("Thus, the question whether the Andrew Memorandum was written as part of his official duties was a disputed issue of material fact that cannot be decided on a motion to dismiss pursuant to Rule 12(b)(6)." (citing *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007))). The Court concludes Crystal has stated a valid claim for relief because it is plausible he acted outside the scope of his official duties when he reported his fellow officers' misconduct to the State's Attorney's Office, and the resolution of this question is more properly reserved for a future motion for summary judgment or, perhaps, trial.

### B. Count I: Testifying at the Criminal Trials

Crystal's next claim is that he faced retaliation for testifying at Gialamas's and Williams's trial. (Compl. ¶ 65.) Similar to the reporting, Crystal contends he testified as a

"concerned citizen."  (*Id.*)  Defendants argue that testifying is a normal and routine part of an officer's job, thus making Crystal's testimony pursuant to his official duties and barring his claim.  (Def. Amador's Mot. to Dismiss 11-13; Defs. Batts & BPD's Mot. to Dismiss 13-15).  For the reasons that follow, the Court will deny Defendants' motions to dismiss this portion of Crystal's claim.

In *Lane v. Franks*, 134 S. Ct. 2369, the Supreme Court addressed the issue of whether a public employee's testimony could constitute citizen speech for the purposes of First Amendment retaliation.  Lane was the director of CITY, a statewide program for underprivileged youth.  *Id.* at 2375.  "[He] was responsible for overseeing CITY's day-to-day operations, hiring and firing employees, and making decisions with respect to the program's finances."  *Id.*  Lane conducted an audit after the program faced serious financial difficulties, and the audit revealed that an employee was defrauding the government.  *Id.*  Lane exposed this employee's criminal misconduct and testified at her grand jury, original trial, and retrial proceedings.  *Id.*  Franks, the then-President of the community college that hired Lane, eventually terminated the program along with its remaining employees, including Lane.  *Id.* at 2376.  Lane then sued Franks, alleging Lane was fired in retaliation for his testimony.  *Id.*

Relying on *Garcetti*, the district court held Lane was not speaking as a citizen when he testified because he had "'learned of the information . . . while working as Director at [CITY].'"  *Id.* (quoting *Lane v. Cent. Ala. Cmty. Coll.*, No. CV-11-BE-0883-n, 2012 WL 5289412, at *10 (N.D. Ala. Oct. 18, 2012) (second alteration in original)).  The Eleventh Circuit affirmed, reasoning that "[e]ven if an employee was not required to make the speech as part of his official duties, he enjoys no First Amendment protection if his speech 'owes its existence to [the] employee's professional responsibilities' and is 'a product that "the employer itself has

commissioned or created."'" *Lane v. Cent. Ala. Cmty. Coll.*, 523 F. App'x 709, 711 (11th Cir. 2013) (unpublished)).  The fact that Lane testified "pursuant to a subpoena and in the litigation context" was irrelevant to the Eleventh Circuit.  *Id.* at 712.  The Supreme Court reversed the Eleventh Circuit on its official duties analysis, holding that "a public employee who provided truthful sworn testimony, compelled by a subpoena, outside the course of his ordinary job responsibilities" was protected by the First Amendment.  *Lane v.* Franks, 134 S. Ct. at 2374-75. The Court reasoned that "[s]worn testimony in judicial proceedings is a quintessential example of speech as a citizen . . . [because] [a]nyone who testifies in court bears an obligation, to the court and society at large, to tell the truth."  *Id.* at 2379.  Different obligations a public employee may have towards his employer, such as "not to show up to court dressed in an unprofessional manner," are "distinct and independent from the obligation, as a citizen, to speak the truth."  *Id.* Therefore, "the mere fact that a citizen's speech concern[ed] information acquired by virtue of his public employment" was not dispositive.  *Id.*  "The critical question under *Garcetti* [was] whether the speech at issue [was] itself ordinarily within the scope of an employee's duties, not whether it merely concern[ed] those duties."  *Id.*

*Lane* is a helpful illustration of the Supreme Court's attempt at reigning in lower courts' broadening of *Garcetti*.  *See id.* at 2379 ("In holding that Lane did not speak as a citizen when he testified, the Eleventh Circuit read *Garcetti* far too broadly.").  The facts of *Lane*, however, are distinguishable from the instant case.  In *Lane*, the plaintiff was the director of an underprivileged youth program.  *Id.* at 2375.  In contrast, Crystal was a law enforcement officer who may have testified regularly at criminal trials.  The Court anticipated this distinction, but explicitly declined to address it.  *See, e.g.*, *id.* at 2378 n.4 ("It is undisputed that Lane's ordinary job responsibilities did not include testifying in court proceedings. . . .  We accordingly need not

address in this case whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties, and express no opinion on the matter today."); *id.* at 2384 (Thomas, J., concurring) ("For some public employees—such as police officers, crime scene technicians, and laboratory analysts—testifying is a routine and critical part of their employment duties. . . . The Court properly leaves the constitutional questions raised by these scenarios for another day."). Therefore, whether Crystal's testimony is protected under *Lane* remains an open question.

In support of his assertion that his testimony was protected speech, Crystal supplied eight cases from various courts holding that a police officer's testimony at trial was protected speech. (*See* Pl.'s Opp'n at 16-18.)   However, all of these cases pre-dated *Garcetti*, a decision that significantly limited a plaintiff's ability to bring a free speech retaliation claim by introducing the "official duties" inquiry into the First Amendment retaliation analysis.   Thus, Crystal's reliance on these authorities is misplaced.   Still, whether Crystal's testimony is protected speech remains an open question and cannot be resolved at this early stage.   Consequently, Defendants' motions to dismiss this part of Count I will be denied.

### C.  Count I: The Interview

The last contention of Crystal's first count is that he was subject to retaliation for submitting to a media interview about the harassment he had received in relation to his reporting and testifying.   (Compl. ¶ 69.)   Defendants Batts and BPD argue that Crystal "was speaking as an agent of the BPD within the scope of his duties as though he had been deputized into a temporary public relations position" because BPD coordinated the interview.   (Defs. Batts & BPD's Mot. to Dismiss 16.)   They have cited no legal authority to support this contention, the Court was unable to find any such support, and the complaint includes no factual allegations that

Crystal occupied a public relations position of any kind except for this isolated instance. Therefore, because it is plausible that participating in a media interview approved by BPD was not part of Crystal's "day-to-day" duties, and because Crystal has not pled to the contrary, Defendants' motions to dismiss this portion of Count I are denied.

### D.  Counts I and II: Causation as to Amador

Amador argues Crystal has failed to plead that two of his speech activities, the testifying and interviewing, *caused* Amador's alleged retaliation.  (*See* Def. Amador's Mot. to Dismiss 11.) Because both the trial testimony and interview occurred in February 2014, and considering that Crystal's allegation involving Amador charged conduct occurring most recently in November 2012, Amador argues the alleged timing of events is nonsensical; thus, he could not have engaged in retaliatory actions in 2012 for protected speech activity that happened in 2014.  (*Id.*) Consequently, those portions of Count I against him should be dismissed.  (*Id.*)  Crystal's Opposition does not address this argument.  The Court finds Amador's contention persuasive.

"In order to demonstrate causation for a First Amendment retaliation claim, the plaintiff must plead facts showing 'that the protected speech was a substantial factor in the decision to take the allegedly retaliatory action.'"  *Miller v. Hamm*, Civil No. CCB-10-243, 2011 WL 9185, at *6 (D. Md. Jan. 3, 2011) (quoting *Goldstein v. Chestnut Ridge Vol. Fire Co.*, 218 F.3d 337, 352 (4th Cir. 2000)).  In analyzing Crystal's complaint on a Rule 12(b)(6) motion to dismiss, the Court must accept all allegations as true and draw all reasonable inferences in his favor.  *See id.* Then, if Crystal "has set forth sufficient facts to make it plausible that his protected expression was a substantial factor" in his adverse employment action, the motion to dismiss should be denied.  *Id.*

Crystal's last alleged retaliatory action by Amador is getting transferred out of VCIS on November 8, 2012.  (*See* Compl. ¶ 51.)  It is also plausible that the dead rat found on Crystal's vehicle on November 23, 2012, was also an action taken or fostered by Amador in response to Crystal's reporting to the State's Attorney's Office in October of the same year.  (*See id.* ¶¶ 23-24, 48.)  Therefore, on its face, the complaint alleges plausible causation between Crystal's reporting and these alleged instances of Amador's retaliatory conduct.  However, the complaint has not plausibly alleged that the other two protected speech activities—which occurred over a year and half after Amador's alleged involvement—are causally connected to Amador's conduct. Thus, as to this defendant, the complaint is limited to its allegations of retaliation by Amador to his conduct prior to Crystal's testimony and interview, and Amador's motion to dismiss Counts I and II will be granted as to any other alleged conduct by him.

### E.  Count I: Qualified Immunity

Defendants Amador and Batts argue Crystal's Count I First Amendment retaliation claims against them in their personal capacities should be dismissed under the doctrine of qualified immunity.  (Def. Amador's Mot. to Dismiss 13-14; Defs. Batts & BPD's Mot. to Dismiss 16-18).  Given recent elucidation by the Fourth Circuit in *Hunter*, however, Defendants' assertion of qualified immunity is not well founded.

The doctrine of qualified immunity protects government officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*). Law is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 534.  "[T]he nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity."

*Edwards v. City of Goldsboro*, 178 F.3d at 251. "Rather, the unlawfulness must be apparent in light of pre-existing law." *Trulock v. Freeh*, 275 F.3d 391, 400 (4th Cir. 2001).

The Fourth Circuit in *Hunter* recognized substantially narrowed qualified immunity protections for officials in First Amendment retaliation cases involving police officers. The Court explicitly reaffirmed an earlier case, *Durham v. Jones,* holding that "'it was clearly established in the law of this Circuit in September 2009 that an employee's speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected.'" 789 F.3d at 401 (quoting *Durham*, 737 F.3d at 303-04 (citation omitted)). The *Hunter* Court also dismissed the defendants' argument that *Durham* was distinguishable because the plaintiffs there had reached out to the news media, and not to the governor as the plaintiffs had in *Hunter. Id.* at 402. The Court found this distinction irrelevant because "nothing in [its] . . . reasoning or broadly-worded holdings in either *Andrew* or *Durham* suggest[ed] that that fact was somehow dispositive." *Id.*

Defendants here similarly try to circumscribe the "clearly established" inquiry by asking whether it was clearly established that the reporting, testifying, or interviewing was not within Crystal's "official duties." Defendants' argument is similar to the unsuccessful argument made in *Hunter*, and the Fourth Circuit found no merit in these particular distinctions. Therefore, applying the reasoning in *Hunter*, the Court will deny Defendants' motions to dismiss Count I based on qualified immunity.

### F.  Count II: Article 40 of the Maryland Declaration of Rights

Crystal's second count against all Defendants alleges the same free speech retaliation pled in the first Count, but brings a claim under the state, rather than federal, constitution. (*See* Compl. ¶ 78.)  Because Maryland state constitutional claims are subject to the Local Government

Tort Claims Act ("LGTCA"), Crystal had 180 days from the alleged instances of retaliation to give notice of his claim to the local government.  Amador challenges the sufficiency of Crystal's notice, while Defendants Batts and BPD do not.  Nevertheless, because Maryland case law treats notice as a "condition precedent" to suit, *see Hansen v. City of Laurel*, 25 A.3d 122, 130 (Md. 2011), the Court will consider the sufficiency of notice against all Defendants, and, for the reasons below, will dismiss Count II in its entirety against Amador and limit it in part against Defendants Batts and BPD.[2]

The Court's analysis is generally the same as to both federal and Maryland state free speech retaliation claims.  *See Newell v. Runnels*, 967 A.2d 729, 743 n.11 (Md. 2009) ("We interpret the provisions of Article 40 as generally 'co-extensive' with the protections of the First Amendment.").  However, two important distinctions exist between federal and state law in this regard.  First, no qualified immunity defense is allowed for claims under Maryland's Constitution.  *Franklin v. Clark*, 454 F. Supp. 2d 356, 363 (D. Md. 2006).  Second, and more importantly for the case at bar, the LGTCA applies to Maryland state constitutional claims.  *See Rounds v. Md.-Nat. Capital Park & Planning Comm'n*, 109 A.3d 639, 652 (Md. 2015) ("Our conclusion that the notice requirement ordinarily applies to state constitutional claims for damages is amply supported by our caselaw.").  Therefore, in order to pursue his Count II state constitutional claims against Defendants, Crystal must first have given notice in accordance with this statute.

Crystal alleges in his complaint that notice was given on October 30, 2014 (Compl. ¶ 7), an apparent attempt to satisfy the notice requirement of the LGTCA, where "an action for unliquidated damages may not be brought against a local government or its employees unless the

---

[2] BPD is entitled to sovereign immunity as discussed *infra*, and therefore, Count II will ultimately be dismissed against it.

notice of the claim required by this section is given within 180 days after the injury." Md. Code Ann., Cts. & Jud. Proc. § 5-304(b)(1) (LexisNexis 2012). BPD is a "local government" within the meaning of the statute, § 5-301(d)(21) (listing "The Baltimore City Police Department" as a "local government"); thus, the notice requirement applies to all of Crystal's state law claims.

Because the Court limited Crystal's retaliation claims against Amador as discussed *supra*, the Court need only analyze, as to Amador, whether Crystal satisfied the LGTCA notice requirement for the portion of his retaliation claim allegedly caused by Crystal's reporting to the State's Attorney's Office.[3] Looking at the complaint most favorably as to Crystal, the clock started running after the rat incident involving Crystal's vehicle on November 28, 2012. Therefore, he had 180 days from the rat incident (*i.e.*, until May 27, 2013) to give notice. Because Crystal's alleged notice was October 30, 2014, over a year past the required date, his claim is time-barred and he has pled himself out of court regarding Count II against Amador.[4]

Crystal argues he may escape his pleading's alleged deficiency because "open factual issues [exist] as to whether Amador's conduct as alleged in the complaint were [*sic*] performed in, or outside, the scope of his employment, or whether Sgt. Amador's actions were performed with malice." (Pl.'s Opp'n Supp. Mem. 24.) The Court finds Amador was acting within the scope of his employment with BPD and, further, the notice requirement applies even if Amador acted with malice.

---

[3] The Court may revisit this point in the event that Plaintiff amends his Complaint to include further factual allegations linking Amador and the later speech activities as discussed *supra*.

[4] If Plaintiff wishes to put forward an argument for substantial compliance with the LGTCA's notice requirement and thereby be excused from strict compliance, he must do so either through an affidavit (supported by exhibits, if they exist) filed with the Court or through amendment of his Complaint. The Court will not accept a threadbare argument in a footnote. (*See* Pl.'s Opp'n Supp. Mem. 26 n.12.) By either route, he must provide detailed facts establishing the content of the written notice, its recipient, the date, and the method of notification. Failing either of those choices, Plaintiff may submit a motion that, again with detailed particularity, establishes good cause for lack of compliance and seeks waiver of the LGTCA notice requirements.

The LGTCA provides that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given . . . ." § 5-304(b)(1).  On its face, the plain language of the statute contemplates that the notice requirement applies to all actions for unliquidated damages against local governments and their employees.  Crystal contends that Amador can only "enjoy immunity under the Local Government Tort Claims Act" if a jury determines that Amador was acting within the scope of employment.  (Pl.'s Opp'n 26.)

In *Ennis v. Crenca*, 587 A.2d 485 (Md. 1991), the Maryland Court of Appeals interpreted Sections 5-302 and 5-303 (then codified as Sections 5-402 and 5-403) and concluded that "[n]otice is not required where an action is based on alleged conduct outside of the employee's scope of employment because, under Sections 5-402 and 5-403, the statute is applicable only to 'tortious acts or omissions committed by an employee within the scope of employment with the local government.'" *Ennis*, 587 A.2d at 489.  Therefore, "[w]hether [plaintiff] was required to comply with the notice provisions of the Act . . . depend[ed] on whether [defendant] was acting within the scope of [his] employment . . . ."[5]  *Id.*; *Downey v. Collins*, 866 F. Supp. 887, 890 (D. Md. 1994) (same).  For the case at bar, however, it is clear from the allegations in the complaint that Amador was acting within the scope of his employment with BPD in his alleged conduct.

The court in *Ennis* laid out the means for determining the scope of employment:

---

[5] The Court's research also revealed the case of *Chappelle v. McCarter*, which has been cited by several courts, including this one, for the proposition that "the notice requirement that applies to any action for unliquidated damages against an employee is not limited to actions in which the employee was acting within the scope of employment . . . ." 873 A.2d 458, 462 (Md. Ct. Spec. App. 2005); *see, e.g.*, *Johnson v. Balt. City Police Dep't*, Civil No. WDQ-12-0646, 2013 WL 6048991, at *10 n.38 (D. Md. Jan. 29, 2013); *Johnson v. Balt. Cnty.*, Civil Action No. ELH-11-cv-3616, 2012 WL 2577783, at *24 n.20 (D. Md. July 3, 2012).  This authority is opposite to *Ennis*, and the reason for this schism in Maryland's jurisprudence is unclear.  Where these authorities conflict, however, the Court is bound by the Court of Appeals's precedent in *Ennis*, which is still good law.  Regardless, neither authority changes the disposition of this issue because, as discussed *supra*, the notice requirement applies under both *Ennis* and *Chappelle*.

> [T]he overall test is whether the tortious acts "were done by the [employee] in furtherance" of the employer's business and "were such as may fairly be said to have been authorized by him. By 'authorized' [it] is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to" the employee by the employer.

*Ennis*, 587 A.2d at 489 (quoting *Sawyer v. Humphries*, 587 A.2d 467, 470 (Md. 1991)) (second alteration in original). "Moreover, where an employee's actions are personal, or where the employee is acting to further his own interests, the conduct is normally outside the scope of employment." *Id.* Crystal's pled acts of retaliation by Amador in response to Crystal's reporting include a disturbing phone call regarding being a witness against Gialamas and Williams (Compl. ¶ 28); a request to falsify a Confidential Informant slip used in a controlled drug buy (*id.* ¶ 34); a refusal to reimburse Crystal for that buy (*id.*); a direct threat of physical harm (*id.* ¶ 45); multiple calls to harass Crystal about "snitching to Internal Affairs" (*id.* ¶ 46); constant refusal to provide backup (*id.* ¶ 51); and eventually transferring Crystal out of VCIS (*id.*). In his complaint, Crystal has emphasized these events resulted from the culture of BPD, and BPD would "condone this type of behavior" (*id.* ¶ 29) and that it "was known and tolerated" by them (*id.* ¶ 86). According to the complaint, all of these alleged instances of retaliation were done by Amador in furtherance of BPD's objective of "cover[ing] up" the assault (*id.* ¶ 22) and preventing his whistleblowing of police misconduct (*id.* ¶ 62). Therefore, Crystal has pled that Amador acted in furtherance of this "cover up" objective and that all of the above actions were taken in his capacity as a supervisor in VCIS in response to Crystal's conduct in reporting something he saw on the job. Because Amador's conduct was incidental to his duties, Crystal must satisfy the notice requirement of the LGTCA.

Crystal also argues open factual issues exist as to whether Amador acted with malice, and because the possibility exists, Crystal may evade the notice requirement. (Pl.'s Opp'n Supp.

Mem. 24, 26.)  He misreads the LGTCA in this regard.  A finding of malice only operates to allow a plaintiff to execute a judgment against the employees themselves, rather than the local government.  *See* § 5-302(b)(2)(i).  It also allows the local government to seek indemnification from the employee.  *See* § 5-302(b)(2)(ii).  It does not allow a potential tort plaintiff to evade the notice requirement of Section 5-304.  The one case cited by Crystal on this point makes no mention of the notice requirement of the LGTCA.  *See Houghton v. Forrest*, 989 A.2d 223 (Md. 2010).  Therefore, Amador's motion to dismiss Crystal's second count against him will be granted subject to reconsideration in the event that Crystal supplements or amends his complaint.

Although Defendants Batts and BPD did not raise the argument, the Court will also apply *Hansen*'s ruling affirming notice as a condition precedent to an LGTCA suit and dismiss Count II against them except for the four instances of retaliation alleged within the 180-day window of the alleged October 30, 2014, notice (*i.e.*, anything after May 3, 2014):  (1) the revocation of Crystal's security clearance on or about June 2014 (Compl. ¶ 58); (2) Crystal's use of five vacation days to figure out where to report for a new burglary detail despite requests for clarification (*id.*); (3) his being told to clean out his office (*id.* ¶ 59); and (4) his forced resignation (*id.* ¶ 60).  Because the Department is entitled to sovereign immunity as discussed *infra*, and because Amador's motion to dismiss Count II will be granted, Crystal's second count only survives against Batts and will be limited to just those instances of retaliation that occurred after May 3, 2014.

### G.  Count III: Violation of the Maryland Wage Payment Collection Law

Crystal's third Count alleges BPD violated the Maryland Wage and Hour Law ("MWHL") by withholding his last paycheck, including unused sick and vacation time.  (Compl. ¶¶ 79-81.)  BPD offers two defenses to this claim:  (1) it has sovereign immunity, and (2) BPD is

not an "employer" within the meaning of the statute.  (*See* Defs. Batts & BPD's Mot. to Dismiss 20-22.)  Crystal does not respond to the immunity claim and therefore has effectively conceded it, but opposes the Department's construction of the statute.  (*See* Pl.'s Opp'n Supp. Mem. 22-23.)  Crystal also seeks leave to amend his complaint to add a claim under the Federal Fair Labor Standards Act ("FLSA") should this count be dismissed.  (*See id.*)  BPD's motion to dismiss will be granted because it enjoys sovereign immunity, as explained *infra* in Part IV.H.[6]  Also, Crystal will be given leave to amend his complaint to add a claim under the FLSA.

The Federal Rules of Civil Procedure provide that "a party may amend its pleading . . . [with] the court's leave" and that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  "[T]he general rule is that leave to amend a complaint under Federal Rule of Civil Procedure 15(a) should be freely given . . . unless 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'"  *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 390 (4th Cir. 2008) (quoting *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006)). This is Crystal's first amendment, the parties are still at an early stage in litigation, and there is no evidence or suggestion of bad faith.  Also, the Court has no reason to believe that an amendment would be futile because former employees may maintain an FLSA action against BPD.  *See Alderman v. Balt. City. Police Dep't*, 952 F. Supp. 256, 259 (D. Md. 1997) (finding

---

[6] To the extent sovereign immunity may not be applicable to a claim under Maryland statutes governing the payment of wages, the Court agrees with BPD that it is not an "employer" within the meaning of the Maryland Wage Payment Collection Law ("MWPCL"), Md. Code, Labor and Employment § 3-501 *et seq.*  The definition of "employer" to include a "governmental unit" in one segment of the MWPCL pertaining to confidentiality of Social Security Numbers, Md. Code Ann., Lab. & Empl. § 3-502(d)(1), would be unnecessary if the general statutory definition of "employer," § 3-501(b), could be read to include governmental units.  *See Koelker v. Mayor & City Council of Cumberland*, 599 F. Supp. 2d 624, 638-39 (D. Md. 2009) (finding correct interpretation of "employer" as excluding "governmental units" under MWHL).  The Court applies the reasoning in *Koelker* to arrive at this same conclusion regarding the MWPCL.  Thus, on this separate ground, dismissal of BPD from the MWPCL count would be required.

that BPD was a "City Agency" for Eleventh Amendment purposes and thus subject to an FLSA action).  Therefore, leave to amend to add a claim under the FLSA will be granted.[7]

### H.  Counts II, III, & IV: Sovereign Immunity

BPD argues Crystal's state law claims against it should be dismissed because it is entitled to sovereign immunity.  (*See* Defs. Batts & BPD's Mot. to Dismiss Supp. Mem. at 19-20.)  BPD is correct in asserting that the State of Maryland and state agencies are generally immune from suit as to state law claims.  *See Md.-Nat'l Capital Park & Planning Comm'n v. Kranz*, 521 A.2d 729, 731 (Md. 1987) ("As this Court has often pointed out, the doctrine that the State of Maryland and state agencies are generally immune from suits . . . 'is firmly embedded in the law of Maryland.'"  (quoting *Austin v. City of Baltimore*, 405 A.2d 255 (Md. 1979))); *see also Lee v. O'Malley*, 533 F. Supp. 2d 548, 554 (D. Md.), *aff'd*, 249 F. App'x 966 (4th Cir. 2007) (unpublished).  As BPD has been held to be a state agency, it enjoys common law sovereign immunity from tort liability.  *See Balt. Police Dept. v. Cherkes*, 780 A.2d 410, 428 (Md. Ct. Spec. App. 2001) ("[BPD] exists as an agency of the State, and therefore enjoys the common law sovereign immunity from tort liability of a State agency.").  This immunity applies to state law claims for damages, and is absolute unless waived by statute.  *Id.* at 424.  The only waiver that is relevant to BPD is the LGTCA, which is limited to BPD's duty to "defend or indemnify an employee."  *Id.* at 434.  Besides this waiver of immunity, BPD's "State sovereign immunity remain[s] intact."  *Id.*  Therefore, Crystal's state law claims—Counts II, III, and IV—against BPD will be dismissed.

---

[7] Plaintiff has only sought leave to amend the Complaint in this one respect.  Any other amendments would only be allowed upon specific motion for such.

*V. Conclusion*

Accordingly, for the reasons discussed herein, Defendants' motions to dismiss for failure to state a claim will be granted in part and denied in part.

Amador's motion to dismiss Count I will be denied with respect to Crystal's alleged speech activity of reporting to the State's Attorney's Office, but granted with respect to Crystal's testifying and interviewing.  Amador's motion to dismiss Count II will be granted in its entirety. Therefore, only the first speech activity in Crystal's first Count survives against Amador in both his personal and official capacities.

Defendants Batts and BPD's motion to dismiss or, in the alternative, for summary judgment, will be construed as a motion to dismiss and will similarly be granted in part and denied in part.  The motion to dismiss Count I against them will be denied.  Count II will survive against Batts regarding the four instances of retaliation discussed in Part IV.F, *supra*.  Counts II, III, and IV will be dismissed in their entirety against BPD.  Crystal will be granted leave to amend to add an unpaid wages claim under the FLSA.  A separate order follows.

DATED this 25th day of September, 2015.

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge

26